Albert J. AVENAL, Jr., and 129 similarly situated, Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–Appellee.

No. 95–5149.

United States Court of Appeals, Federal Circuit.

Nov. 12, 1996.

**934**

Wendell H. Gauthier, Gauthier & Murphy, Metairie, Louisiana, for plaintiffs-appellants. Of counsel on the brief were Michael X. St. Martin and Michelle M. Davis, St. Martin & Lirette, and Carolyn McNabb, P.L.C., Houma, Louisiana.

Martin W. Matzen, Attorney, Environment and Natural Resources Division, Department of Justice, Washington, D.C., for defendant-appellee. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Jacques B. Gelin and Thorton Withers Field. Of counsel on the brief was Marco A. Rosamano, U.S. Army Corps of Engineers, New Orleans, Louisiana. Of counsel was David C. Shilton, Attorney, Environment and Natural Resources Division, Department of Justice, Washington, D.C.

Before RICH, NEWMAN and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a Takings case.[1] Albert Avenal, Jr. and 129 similarly situated plaintiffs ("Avenal" or "plaintiffs") leased oyster beds from the State of Louisiana. During the lease term, fresh-water diversion projects under the aegis of the United States altered the salinity level in the water over the oyster beds, thus rendering the beds unsuitable for oyster cultivation. Plaintiffs brought suit in the Court of Federal Claims alleging a taking by the United States ("Government") in violation of the Fifth Amendment of the Constitution.

The Court of Federal Claims on summary judgment dismissed the claims, holding that Avenal never acquired a constitutionally protectable property interest. We affirm the judgment of the Court of Federal Claims, although on different grounds.

BACKGROUND

The properties involved in this case are in The Breton Sound Basin, a part of the coastal waters of Louisiana lying east of the Mississippi River and south of New Orleans. Because the area contained a broad mixing zone of freshwater outflow from the Mississippi River and smaller coastal streams and the saline waters of the Gulf of Mexico, the area historically provided excellent conditions for oyster growth.

But life for the oysters, and for those who made their living harvesting them, did not remain sweet. Oysters to thrive need a salinity level ranging from 5 parts per thousand to 15 parts per thousand. Over time, both man-made and natural changes to the area caused the salinity levels in the subdelta marsh lands below New Orleans to increase. The parties attribute the changes in salinity primarily to man-made causes, including the establishment of a levee system for flood control on the Mississippi, and oil and gas exploration that involved extensive canal networks. The natural changes stemmed from subsidence, shoreline erosion, and drought, all adding to the saltwater intrusion.

There is evidence that as early as 1900 the relevant state agencies and various parishes (similar to counties) were considering the idea that freshwater be diverted from the Mississippi River to adjacent marsh lands in order to improve oyster habitats and to reduce the mortality rate associated with increased salinity. In 1959, in a memorandum written by the United States Department of the Interior's Fish and Wildlife Service to the United States Army Corps of Engineers ("Corps"), the Interior Department set forth its conclusions resulting from an investigation into the advisability of establishing

---

**1.** "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

freshwater diversions via structures to be built for that purpose. The investigation itself was prompted, in part, by requests from local groups, including the oyster industry, concerning the need for such diversions.

The 1959 memorandum discussed a marked reduction in oyster yield that had occurred over time, and concluded that freshwater diversion would be beneficial in that it would re-establish natural patterns of salinity and increase oyster-bed fertility. The memorandum identified four separate areas in Plaquemines Parish as freshwater diversion sites, two of which are on the east side of the Mississippi. One of these two, Area 4, is in the vicinity of Scarsdale, in the upper landward end of the Breton Sound Basin. The area was described in the memorandum as itself being too fresh to support an oyster fishery, so that the effect of the Area 4 diversion would not be to change the salinity levels themselves, but to combat the effects of subsidence and push back salt-water intrusion.

The 1959 memorandum was later incorporated into House Document No. 308, which led to the passage, on October 27, 1965, of the Public Works—Rivers and Harbors Act, Pub.L. No. 89–298, 79 Stat. 1037 (1965) (the "Act"), which authorized certain freshwater diversion structures to be built in and around the Breton Sound Basin. During 1968 and 1969 the Corps met with, among others, the Louisiana Wildlife and Fisheries Commission and the Plaquemines Parish Commission Council to discuss proposed locations for these Congressionally-authorized diversion structures. During public hearings, the Corps proposed Caernarvon as the location of the freshwater diversion structure for Area No. 4.

Meanwhile, due to continuing salinity changes the zone favorable for oyster growth continued to move landward. This landward salinity movement spawned an oyster community in the marsh lands in the northwest portion of the Breton Sound Basin, in the area which had previously been too fresh to sustain such growth. While creating new oyster grounds, the change in salinity had the effect of rendering unusable large areas of previously productive oyster grounds.

During the 1970's oyster farmers engaged in the spawning and harvesting of oysters noted the changed conditions in the northwest landward part of the Basin and entered into water-bottom lease agreements with the State of Louisiana for the areas then usable as oyster beds.

Over the ensuing years the Corps and relevant state and local agencies continued to discuss at informal meetings the construction of a freshwater diversion structure at Caernarvon. It was known by all parties, including both the state and plaintiffs, that the Caernarvon project would create an area in which conditions again would become too fresh for oyster cultivation, and that this area would coincide with an area which had been formerly too fresh for oyster cultivation. On January 21, 1982, the State of Louisiana submitted a letter to the Corps, announcing its intent to participate in the Caernarvon freshwater diversion project. The Corps and the State issued a joint public notice regarding the construction surrounding the Caernarvon project.

On October 30, 1986, Congress authorized the funds for the construction of the Caernarvon project. The State of Louisiana entered into a formal agreement with the Corps stipulating that the State would maintain and operate the facilities following completion of construction, and that the State would be responsible for 25 percent of the total costs of construction. The agreement further provided an indemnification clause under which the State would indemnify the Federal Government for any losses occasioned by claims for "damages arising from the construction, operation, maintenance, and rehabilitation of the project...." The Caernarvon project was completed in due course, and it had the expected effect on the salinity levels in the Breton Sound Basin. Although the Caernarvon project was not itself completed until 1991, other freshwater diversion structures, upon which Caernarvon was modeled, had been completed earlier, some going back as early as 1956 (Bayou Lamoque) and 1964 (White Ditch Siphon).

On April 26, 1994, plaintiffs, who owned leases from the State of water-bottom lands used for oyster propagation, filed a complaint

in the United States Court of Federal Claims, alleging a taking of their leasehold interests resulting from the Caernarvon project. Specifically, plaintiffs alleged that the Caernarvon project diluted the salinity level in the waters above their leased grounds and caused silt deposits in the leased area. These conditions were not favorable to oyster growth. As a result, the Government's Caernarvon project prevented them from continuing to cultivate oysters on their leased beds.

The Court of Federal Claims granted the Government's motion for summary judgment on the grounds that the oysterers held no compensable property interest. Since the State acquired no property interest in the salinity level of the waters above plaintiffs' leased grounds, plaintiffs could have acquired no such right from the State, and thus no property interest to be taken. Plaintiffs appeal that determination.

## DISCUSSION

 Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. On appeal, the views of the trial court regarding the applicable law in light of the undisputed facts are given full consideration, but a grant of summary judgment is reviewed without special deference to the trial court's decision. In this case, though the parties disagree about certain factual issues, the facts material to the decision are not in genuine dispute. Summary judgment is fully appropriate in such a case; that it is a takings case does not affect the availability of summary judgment when appropriate to the circumstances.

The case was argued below, and the trial judge based her decision, on the issue of whether these plaintiffs owned a compensable property interest. Much of the argument there, as on appeal, focused on whether plaintiffs have a vested right, derived from the State, in an unintended benefit resulting from a federal government project, such that cessation of that benefit, due to the consequences of a separate federal project, warrants compensation under the Fifth Amendment.

The record establishes that plaintiffs own long-term leases from the State, which leases entitle plaintiffs to use the lands under the waters of the Breton Sound Basin for the cultivation and harvesting of oysters. No challenge is made to the right of the State to issue such leases, or to the right of the lessees to engage in the activity for which the leases are issued. The record does not establish exactly when the several plaintiffs first acquired their leases. The trial court, in absence of evidence from the plaintiffs, made the reasonable inference that, for purposes of plaintiffs' complaint, the leases should be considered to have been entered into no earlier than 1976. This was arrived at by subtracting the term of the leases, 15 years, from the date on which the freshwater diversion from the Caernarvon project became operational, 1991.

The leases owned by the several plaintiffs granted them valuable property rights. Louisiana law has long recognized that the property rights created by such leases, authorized by state statute (see La. Rev.Stat.Ann. § 56:423 (West 1995)), have the attributes of other forms of real property, and are entitled to protection from injury by third parties. See e.g., Inabnet v. Exxon Corp., 642 So.2d 1243 (La.1994) (Oil company found liable to oyster lessee for any damages sustained by oyster lessee due to company's dredging of canal.); Butler v. Baber, 529 So.2d 374 (La.1988) (Oyster lessees could recover against mineral lessees for damage to oyster beds and oyster production caused by mineral lessees' dredging operation.). The United States Constitution protects such state-created property interests from uncompensated takings by government, whether that government be state, Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), or federal, Hendler v. United States, 952 F.2d 1364 (Fed.Cir.1991).

The question, then, is not whether plaintiffs had a constitutionally protected property interest, but whether that property interest was taken by the Government. The leasehold estates owned by the plaintiffs entitle them to use the beds of the Basin for the

cultivation of oysters.[2] The result of the series of government decisions that culminated in the Caernarvon project was not to occupy the plaintiffs' property or to have that property used for government purposes, but was to limit the uses of the property available to plaintiffs. There can be no doubt from the record that the limit on plaintiffs' use imposed by the Government's activities had the effect of substantially reducing the value of plaintiffs' property, well beyond the level of "mere diminution." *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1570 (Fed.Cir.1994).

■ When government limits the use a property owner may make of her property, without itself occupying or otherwise using the property for government purposes, the classic analytical tool for assessing whether a taking has occurred is the three-part test enunciated by the Supreme Court in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978): the court considers the character of the governmental action, the economic impact on the claimant and, particularly, the extent to which the governmental action has interfered with distinct investment-backed expectations. *Id.* at 124, 98 S.Ct. at 2659. Though it is a truism that "no set formula exists to determine whether compensation is constitutionally due for a government restriction of property," *Hendler v. United States,* 952 F.2d 1364, 1373 (Fed.Cir.1991), *see Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, the *Penn Central* formulation provides guidance in analyzing what the trial court here viewed as a question of first impression.

The case before us presents a textbook example of a situation in which the plaintiffs, in the face of established public concerns and while governmental efforts to address those concerns were well known, moved to take advantage of the existing conditions for their own economic benefit. There is nothing wrong with their having done that; the State of Louisiana provided the mechanism for it, and their own initiative gave them whatever economic advantages the situation afforded.

It is hard for them to claim surprise, however, that the pre-existing salinity conditions, created at least in part by earlier government activity, were not left alone, but were again tampered with to their (this time) disadvantage.

Though as entrepreneurs they are entitled to capitalize on the opportunities afforded by government action, they cannot here insist on a guarantee of non-interference by government when they well knew or should have known that, in response to widely-shared public concerns, including concerns of the oystering industry itself, government actions were being planned and executed that would directly affect their new economic investments. These concerns and plans date back to the early part of the century, and beginning in the 1950's and 1960's were actively being pursued by state and federal agencies. They were certainly a part of the environment in which the raising and harvesting of oysters in the Louisiana marshes were conducted. Assuming, as we must, that these plaintiffs did not invest in their leases until the 1970's, these plaintiffs, in the words of *Penn Central,* cannot have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments.

The arguments put forward by plaintiffs do not persuade us otherwise. We grant that they have valuable property rights created by the State and protected by the Constitution. These rights include the right to harvest oysters and the right to damages when the acts of another harm the oyster beds, including harm caused by deleterious changes in the waters in which the beds lie, for example by unlawful pollution. We grant that the decrease in salinity in the water covering the plaintiffs' leased grounds has restrained a valuable use of the lease rights. And plaintiffs are correct that the existence of certain hold-harmless clauses in some of the leases for the benefit of the federal government and against the state does not

---

**2.** The trial judge found that the record does not reflect the exact location of plaintiffs' leases. The trial court concluded that, in absence of other proof, the plaintiffs concede that the leases are located in the northwest landward end of the Breton Sound Basin.

change the case. Having said all that, however, what we do not grant these plaintiffs is the right to be free from the planned and announced efforts of the Government to act in ways that would affect their uses of their after-acquired property interests.[3] In light of the history of events in this case, plaintiffs as a matter of law must be assumed to have known that their rights to use the bottomlands for oystering were subject to the inevitable changes that the anticipated government program would bring about.

We reach, then, the same result as the trial court. In this case there was no taking by the United States of a protected property interest. The judgment of the trial court is

AFFIRMED.

---

**3.** Plaintiffs' heavy reliance, particularly in their reply brief, on the panel opinion in *Preseault v. United States*, 66 F.3d 1167 (Fed.Cir.1995), and particularly the role of federal law in defining state property rights, is of course not persuasive since that opinion has since been vacated by vote of the in banc court. *See* 66 F.3d 1190 (Fed.Cir. 1995).