**Lloyd A. GOOD, Jr., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 97–5138.**

United States Court of Appeals, Federal Circuit.

Aug. 31, 1999.

Richard R. Nageotte, Nageotte, Nageotte & Nageotte, of Stafford, Virginia, argued, for plaintiff-appellant. Of counsel was John G. Roberts, Jr., Hogan & Hartson, of Washington, DC.

Ethan G. Shenkman, Attorney, Appellate Section, Environment and Natural Resources Division, Department of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist, and Dorothy R. Burakreis, Attorneys.

Glenn P. Sugameli, National Wildlife Federation, Washington, DC, for amicus curiae The National Wildlife Federation. Of counsel on the brief was James B. Dougherty, Washington, DC.

James S. Burling, Pacific Legal Foundation, of Sacramento, California, for amicus

curiae Pacific Legal Foundation. With him on the brief was Peter G. Gioia, Pacific Legal Foundation, Stuart, Florida.

John D. Echeverria, Georgetown University Law Center, Washington, DC, for amicus curiae Florida Audubon Society.

Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge, and GAJARSA, Circuit Judge.

EDWARD S. SMITH, Senior Circuit Judge.

This is a regulatory takings case. Lloyd A. Good, Jr. sued the federal government on the basis that it effectively took his property without just compensation when the U.S. Army Corps of Engineers denied him permission to dredge and fill on land he owns in the Florida Keys. The U.S. Court of Federal Claims granted summary judgment to the United States. *Lloyd A. Good, Jr. v. United States*, 39 Fed. Cl. 81 (1997). We affirm.

*Facts*

Lloyd A. Good, Jr. ("Good") and his mother purchased a forty-acre tract of undeveloped land on Lower Sugarloaf Key, Florida, in 1973,[1] as part of a much larger real estate purchase. The tract, known as Sugarloaf Shores, consists of thirty-two acres of wetlands (a combination of salt marsh and freshwater marsh) and eight acres of uplands. The sales contract for the land stated that:

> The Buyers recognize that certain of the lands covered by this contract may be below the mean high tide line and that as of today there are certain problems in connection with the obtaining of State and Federal permission for dredging and filling operations.

Good's efforts to develop the property began in 1980, when he hired Keycology, Inc., a land planning and development firm, to obtain the federal, state, and county permits necessary to develop Sugarloaf Shores into a residential subdivision. In their contract, Good and Keycology acknowledged that "obtaining said permits is at best difficult and by no means assured."

Good submitted his first permit application to the U.S. Army Corps of Engineers ("Corps") in March 1981. The Corps permit was required for dredging and filling navigable waters of the United States, including wetlands adjacent to navigable waters, under the Rivers and Harbors Act of 1899[2] and under § 404 of the Clean Water Act.[3] Good proposed filling 7.4 acres of salt marsh and excavating another 5.4 acres of salt marsh in order to create a 54–lot subdivision and a 48–slip marina. The Corps granted the requested permit in May 1983. Good modified the permit in response to county environmental concerns and the modified permit was issued January 6, 1984. Under both permits, the authorized work had to be completed within five years. *See* 33 CFR § 325.6 (1998).

Good and Keycology were also pursuing the required state and county permits. In February 1983, the state Department of Environmental Regulation issued a permit for the requested dredging and filling. The state permit was conditioned, however, on Good obtaining county approval for the project.

On May 10, 1983, Good applied for county approval of the dredge-and-fill proposal that had been approved by the federal and state permits. The county determined that the plan was a "major development" subject to a more stringent environmental review than under standard procedures. After Good appealed the "major development" determination, the County Commission ordered the county to process the permit application under standard review procedures. The county granted Good's permit on July 13, 1984.

1. Good became the sole owner of the property on his mother's death in 1975.

2. 33 U.S.C. § 403 (1994).

3. Pub.L. No. 92–500 § 2, 86 Stat. 884 (Oct. 18, 1972), amending the Federal Water Pollution Control Act (codified as amended at 33 U.S.C. § 1344 (1994)).

At this point, Good had received federal, state, and county approval to develop the property. Florida law, however, presented one more hurdle, in the form of the Environmental Land and Water Management Act, FLA. STAT. ANN. §§ 380.012 to 380.12 (West 1997). The Act created a statutory regime for regulating development in Areas of Critical State Concern, including the entire Florida Keys.[4] Under the Act, the Florida Department of Community Affairs ("DCA") reviews local land development orders in Areas of Critical State Concern and may appeal those orders to the Florida Land and Water Adjudicatory Commission ("FLAWAC").[5] *See* FLA. STAT. ANN. § 380.07 (West 1997). On September 10, 1984, the DCA appealed the county's approval of Good's dredge-and-fill project. FLAWAC held that the county had erred in subjecting Good's plan only to the standard review, and on May 29, 1986 ordered the county to review the project as a "major development."

Making matters worse for Good, the county in the meantime had adopted a new land use plan and new development regulations. The new regulations prohibited dredging to provide access to docks, prohibited filling of salt marsh for building sites, and limited filling of salt marsh to 10% of the salt marsh on a parcel. MONROE COUNTY, FLA. CODE, art. II, § 9.5–345 (1986). Since Good's plan involved dredging to provide boat access between the proposed marina and Upper Sugarloaf Sound, and required filling roughly 25% of the parcel's salt marsh to provide building sites, Good's project would not have been allowed under the new regulations.

Good filed suit in state court, alleging that the state had taken his property without just compensation and that FLAWAC's order was an unreasonable exercise of police power. That suit was settled on October 22, 1987. The consent decree provided that Good's application would be evaluated under the repealed major development review standard but that any future development of Sugarloaf Shores would be subject to later-enacted land use regulations.

Good's efforts to get state and county approval for his project had used up most of the five-year time limit on the federal permits issued in 1983 and 1984. Good therefore requested that the Corps extend the time limits of the permits. The Corps denied Good's request to reissue the permits without changes, but granted a new permit allowing substantially the same development on October 17, 1988.

The county gave preliminary approval to Good's plan on November 9, 1989. Final county approval, however, was subject to fifteen conditions, the most significant of which was approval of the project by the South Florida Water Management District (SFWMD).

Good filed an application with SFWMD. A few months later, SFWMD notified Good that its staff recommended denying the application, based on "the unmitigated loss of wetlands, the loss of habitat for the endangered species within them [i.e., the state-listed mud turtle and Lower Keys marsh rabbit] and the lack of reasonable assurance that future unmitigated wetlands destruction will not occur due to the lack of the above-requested dedication." In view of this negative review, Good requested that his application be removed from SFWMD's agenda. He never reactivated the application or otherwise obtained SFWMD approval for his project.

Apparently despairing of ever obtaining approval for his 54–lot plan, Good submitted a new, scaled-down plan to the Corps

---

**4.** The Keys were designated an Area of Critical State Concern in 1977. Although the Florida Supreme Court later held the Act's procedure for designating Areas of Critical State Concern to be unconstitutional, *see Askew v. Cross Key Waterways*, 372 So.2d 913, 918 (Fla.1978), the Florida Legislature formally so designated the Keys in the Florida Keys Protection Act of 1979, FLA. STAT. ANN. § 380.0552 (West 1997).

**5.** FLAWAC is composed of the Governor and Cabinet of the State of Florida. FLA. STAT. ANN. §§ 14.202, 380.07 (West 1997).

in July 1990. In this 1990 permit application, Good proposed building only sixteen homes, together with a canal and tennis court. Although the new plan greatly reduced the overall number of houses, it located all of them in the wetlands area. The overall wetlands loss, therefore, was only reduced from 10.53 acres to 10.17 acres.

Between the time the Corps issued Good's 1988 permit and the time he applied for the 1990 permit, the Lower Keys marsh rabbit was listed as an endangered species under the Endangered Species Act ("ESA"). *See* 16 U.S.C. § 1533 (1994); 55 Fed.Reg. 25,588 (June 21, 1990). The Corps was therefore required to consult with the Fish and Wildlife Service ("FWS") to insure that issuing the requested permit would not place the continued existence of the species in jeopardy. *See* 16 U.S.C. § 1536(a)(2) (1994).

Under this so-called "section 7 consultation," FWS prepared a biological opinion as to whether the proposed permit would put the rabbit in jeopardy. In its biological opinion, issued February 19, 1991, FWS concluded that the project proposed in Good's 1990 permit application would not jeopardize the continued existence of the marsh rabbit. Nevertheless, it recommended denial of the permit based on the development's overall environmental impact.[6]

The FWS biological opinion also instructed the Corps to notify Good not to proceed under his 1988 permit. The 1988 permit had been issued before the marsh rabbit was listed as an endangered species and proposed a different project than the 1990 permit application. Therefore, the FWS "no jeopardy" finding did not apply to the earlier permit, and development pursuant to the 1988 permit could violate the ESA.

On May 14, 1991, the Corps notified FWS that Good intended to proceed with the project allowed by the 1988 permit. The Corps also noted that it did not believe the project would jeopardize the marsh rabbit, but noted that the silver rice rat had been listed as an endangered species subsequent to the FWS biological opinion on the 1990 permit application. *See* 56 Fed.Reg. 19,809 (April 30, 1991).

In response, FWS initiated consultation under the ESA and notified the Corps that it would prepare a new biological opinion evaluating the effect of Good's 1988 plan on both endangered species. On December 18, 1991, FWS released its new biological opinion, concluding that both the 1988 and 1990 plans jeopardized the continued existence of both the Lower Keys marsh rabbit and the silver rice rat.[7] FWS recommended that the Corps deny the 1990 application and modify the 1988 permit to include FWS's "reasonable and prudent alternatives," which included locating all homesites in upland areas and limiting water access to a single communal dock.

The Corps denied Good's 1990 permit application on March 17, 1994. At the same time, the Corps notified Good that his 1988 permit had expired. The Corps based its denial on the threat that either project posed to the endangered rat and rabbit.

*Proceedings in the Court of Federal Claims*

On July 11, 1994, Good filed suit, alleging that the Corps' denial of his permit worked an uncompensated taking in violation of the Fifth Amendment. On cross-motions for summary judgment, the Court of Federal Claims granted summary judgment in favor of the government. The court held that the Corps' denial of Good's permit did not constitute a "per se" taking

---

**6.** FWS made its recommendation pursuant to the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. §§ 662–666 (1994). The Corps was not required to follow this recommendation.

**7.** FWS had earlier concluded that the 1990 plan did not place the marsh rabbit in jeopardy, but changed its mind in view of information showing further decline in the marsh rabbit population.

under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), because the ESA did not require that the property be left in its natural state and because the government had shown that the property retained value, either for development or for sale of transferrable development rights (TDRs), after the permit denial. The court found that Good had not presented sufficient evidence to show a reasonable dispute over the value of the property and rejected Good's legal challenge to the use of TDRs in the value calculation.

The court also held that there had been no taking under the ad hoc analysis of *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The court held that Good lacked reasonable, investment-backed expectations since federal and state regulations imposed significant restrictions on his ability to develop his property both at the time he purchased it and at the time he began to develop it. Finding the lack of reasonable expectations determinative, the court held that no taking had occurred.

### Jurisdiction and Standard of Review

This court has jurisdiction over an appeal from a final judgment of the Court of Federal Claims. *See* 28 U.S.C. § 1295(a)(3) (1994). We review a grant of summary judgment completely and independently, construing the facts in the light most favorable to the non-moving party. Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See State of Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997).

### Analysis

■ The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. The government can "take" private property by either physical invasion or regulatory imposition. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Lucas*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798. Appellant in this case alleges a regulatory taking.

■ It has long been recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Supreme Court has set out "several factors that have particular significance" in determining whether a regulation effects a taking. *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. These factors are (1) the character of the government action, (2) the extent to which the regulation interferes with distinct, investment-backed expectations, and (3) the economic impact of the regulation. *See id. See also Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1179 (Fed.Cir.1994); *Florida Rock Inds., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed.Cir.1994); *Creppel v. United States*, 41 F.3d 627, 632 (Fed.Cir.1994). Because we find the expectations factor dispositive, we will not further discuss the character of the government action or the economic impact of the regulation.

### Reasonable, Investment-backed Expectations

■ For any regulatory takings claim to succeed, the claimant must show that the government's regulatory restraint interfered with his investment-backed expectations in a manner that requires the government to compensate him. *See Loveladies Harbor*, 28 F.3d at 1179. The requirement of investment-backed expectations "limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation." *Creppel*, 41 F.3d at 632. These expectations must be reasonable. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–1006, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

■ Reasonable, investment-backed expectations are an element of every regulatory takings case. *See Loveladies Harbor*, 28 F.3d at 1179. *See also id.* at 1177 ("In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss. In economic terms, it could be said that the market had already discounted for the risk, so that a purchaser could not show a loss in his investment attributable to it."); *Creppel*, 41 F.3d at 632 ("One who buys with knowledge of a restraint assumes the risk of economic loss.").

Good argues that the Supreme Court has eliminated the requirement for reasonable, investment-backed expectations, at least in cases where the challenged regulation eliminates virtually all of the economic value of the landowner's property. In support, Appellant cites *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886, and argues that *Loveladies Harbor* should be reversed as contrary to *Lucas*.

However, we agree with the *Loveladies Harbor* court that the Supreme Court in *Lucas* did not mean to eliminate the requirement for reasonable, investment-backed expectations to establish a taking. It is true that the Court in *Lucas* set out what it called a "categorical" taking "where regulation denies all economically beneficial or productive use of land." 505 U.S. at 1015, 112 S.Ct. 2886. The *Lucas* Court, however, clarified that by "categorical" it meant those "categories of regulatory action [that are] compensable without case-specific inquiry *into the public interest advanced in support of the restraint.*" *Id.* (emphasis added). A *Lucas*-type taking, therefore, is categorical only in the sense that the courts do not balance the importance of the public interest advanced by the regulation against the regulation's imposition on private property rights. *See Loveladies Harbor*, 28 F.3d at 1179.

The *Lucas* Court did not hold that the denial of all economically beneficial or productive use of land eliminates the requirement that the landowner have reasonable,

investment-backed expectations of developing his land. In *Lucas*, there was no question of whether the plaintiff had satisfied that criterion. *See id.* at 1006–1007, 112 S.Ct. 2886 ("In 1986, petitioner David H. Lucas paid $975,000 for two residential lots on the Isle of Palms in Charleston County, South Carolina, on which he intended to build single-family homes. In 1988, however, the South Carolina Legislature enacted the Beachfront Management Act, S.C.Code Ann. § 48–39–250 *et seq.* (Supp.1990), which had the direct effect of barring petitioner from erecting any permanent habitable structures on his two parcels.").

■ In addition, it is common sense that "[o]ne who buys with knowledge of a restraint assumes the risk of economic loss. In such a case, the owner presumably paid a discounted price for the property. Compensating him for a 'taking' would confer a windfall." *Creppel*, 41 F.3d at 632 (citations omitted).

■ Appellant alternatively argues that he *had* reasonable, investment-backed expectations of building a residential subdivision on his property. Appellant reasons that the permit requirements of the Rivers and Harbors Act and the Clean Water Act are irrelevant to his reasonable expectations at the time he purchased the subject property, because he obtained the federal dredge-and-fill permits required by those acts three times, and was only denied a permit, based on the provisions of the Endangered Species Act ("ESA"), when two endangered species were found on his property. Therefore, since the ESA did not exist when he bought his land, he could not have expected to be denied a permit based on its provisions.

Appellant's position is not entirely unreasonable, but we must ultimately reject it. In view of the regulatory climate that existed when Appellant acquired the subject property, Appellant could not have had a reasonable expectation that he would

obtain approval to fill ten acres of wetlands in order to develop the land.

In 1973, when Appellant purchased the subject land, federal law required that a permit be obtained from the Army Corps of Engineers in order to dredge or fill in wetlands adjacent to a navigable waterway. Even in 1973, the Corps had been considering environmental criteria in its permitting decisions for a number of years. *See Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1187 (1981) ("[O]n December 18, 1968, in response to a growing national concern for environmental values and related federal legislation, the Corps [announced that it] would consider the following additional factors in reviewing permit applications: fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest."). *See also id.* at 1190 ("[S]ince the late 1960's the regulatory jurisdiction of the Army Corps of Engineers has substantially expanded pursuant to § 404 of the [Clean Water Act] and—under the spur of steadily evolving legislation—the Corps has greatly added to the substantive criteria governing the issuance of dredge and fill permits."). By 1973, the Corps had denied dredge-and-fill permits solely on environmental grounds. *See, e.g., Zabel v. Tabb,* 430 F.2d 199 (5th Cir.1970).

In addition to the federal regulations, development of the subject land required approval by both the state of Florida and Monroe County. See the discussion of Good's permit application process, *supra.*

At the time he bought the subject parcel, Appellant acknowledged both the necessity and the difficulty of obtaining regulatory approval. The sales contract specifically stated that "[t]he Buyers recognize that ... as of today there are certain problems in connection with the obtaining of State and Federal permission for dredging and filling operations." Appellant thus had both constructive and actual knowledge that either state or federal regulations could ultimately prevent him from building on the property. Despite his knowledge of the difficult regulatory path ahead, Appellant took no steps to obtain the required regulatory approval for seven years.

During this period, public concern about the environment resulted in numerous laws and regulations affecting land development. For example:

- In December 1973, the Endangered Species Act was enacted. 16 U.S.C. § 1531 et seq. (1994). The ESA prohibited federal actions that would be "likely to jeopardize the continued existence of any endangered species," 16 U.S.C. § 1536(a)(2), and made it unlawful to "take" (i.e., kill, harass, etc.) any endangered animal. *See* 16 U.S.C. §§ 1532(19), 1538(a)(1)(B).

- In 1975, the Corps of Engineers issued regulations broadening its interpretation of its § 404 authority to regulate dredging and filling in wetlands. *See United States v. Riverside Bayview Homes,* 474 U.S. 121, 123–124, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In 1977, the Corps further broadened its definition of wetlands subject to § 404's permit requirements. *See id.*

- Also in 1977, Florida enacted its own Endangered and Threatened Species Act, FLA. STAT. ANN. § 372.072 (West 1997), further emphasizing the public concern for Florida's environment. In 1979, the Florida Keys Protection Act was enacted, designating the Keys an Area of Critical State Concern. FLA. STAT. ANN. § 380.0552 (West 1997).

Thus, rising environmental awareness translated into ever-tightening land use regulations. Surely Appellant was not oblivious to this trend.

The picture emerges, then, of Appellant in 1973 acknowledging the difficulty of obtaining approval for his project, then waiting seven years, watching as the applicable regulations got more stringent, before taking any steps to obtain the required approval. When in 1980 he finally retained a land development firm to seek the required permits, he acknowledged that "ob-

taining said permits is at best difficult and by no means assured."

While Appellant's prolonged inaction does not bar his takings claim, it reduces his ability to fairly claim surprise when his permit application was denied. Appellant was aware at the time of purchase of the need for regulatory approval to develop his land. He must also be presumed to have been aware of the greater general concern for environmental matters during the period of 1973 to 1980. As our predecessor court stated on similar facts: "[W]hen Deltona acquired the property in 1964, it knew that the development it contemplated could take place only if it obtained the necessary permits from the Corps of Engineers. Although at that time Deltona had every reason to believe that those permits would be forthcoming when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation." *Deltona*, 657 F.2d at 1193.

Here, as in *Deltona*, Appellant "must have been aware that the standards and conditions governing the issuance of permits could change." *Id.* In light of the growing consciousness of and sensitivity toward environmental issues, Appellant must also have been aware that standards could change to his detriment, and that regulatory approval could become harder to get.

We therefore conclude that Appellant lacked a reasonable, investment-backed expectation that he would obtain the regulatory approval needed to develop the property at issue here. We have previously held that the government is entitled to summary judgment on a regulatory takings claim where the plaintiffs lacked reasonable, investment-backed expectations, even where the challenged government action "substantially reduc[ed] the value of plaintiffs' property." *Avenal v. United States*, 100 F.3d 933, 937 (Fed.Cir.1996). Here, too, Appellant's lack of reasonable,

investment-backed expectations defeats his takings claim as a matter of law.

*Conclusion*

Appellant lacked the reasonable, investment-backed expectations that are necessary to establish that a government action effects a regulatory taking. Therefore, we affirm the grant of summary judgment to the United States.

AFFIRMED.