**PALM BEACH ISLES ASSOCIATES, a Florida Partnership; Martin Slifka, individually and as trustee; Marjorie Margolis and Roberta Franklin, individuals as tenants in common; and the Estate of Joseph Slifka, represented by Alan Slifka and Barbara J. Slifka, co-executors, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 99–5030.

United States Court of Appeals, Federal Circuit.

Decided Nov. 6, 2000.

Luther M. Taylor, of Palm Beach Gardens, Florida, and Michael John Ryan, of Juno Beach, Florida, for plaintiffs-appellants.

Jeffrey C. Dobbins, Attorney, Appellate Section, Environment and Natural Resources Division, Department of Justice of Washington, DC, for defendant-appellee. Ethan G. Shenkman, Attorney, Appellate Section, argued for defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General, Susan V. Cook, John A. Bryson, and Tamara N. Rountree, Attorneys. Of counsel on the brief was Dorothy Boardman, Office of Counsel, U.S. Army Corps of Engineers, of Jacksonville, Florida.

John D. Echeverria, Georgetown University Law Center, of Washington, DC, for amicus curiae Florida Audubon Society.

Timothy J. Dowling, Community Rights Counsel, of Washington, DC for amicus curiae Community Rights Counsel.

Before PLAGER, LOURIE, and CLEVENGER, Circuit Judges.

ON PETITION FOR REHEARING

PLAGER, Circuit Judge.

### ORDER

1.

In the original opinion in this regulatory takings case, the court (1) held that there was a categorical taking of the 50.7 acres at issue; (2) stated its understanding of the law that when there is a categorical taking, i.e., a deprivation of *all* economically viable use of the subject property, the question of investment-backed expectations drops out of the analysis; and (3) concluded that, under the proper analysis of nuisance-type legal defenses remaining to the Government, the federal navigation servitude qualified as such a defense, assuming that protection of navigation was the purpose for the Government's regulatory imposition. *See Palm Beach Isles*

*Assocs. v. United States,* 208 F.3d 1374 (Fed.Cir.2000). We remanded the case to the trial court for fact-finding with regard to the Government's purpose for imposing the regulatory constraint.

The Government has filed a petition for rehearing by the panel, and, in the event it does not succeed in that regard, for rehearing by the court *en banc.* In its petition for rehearing by the court *en banc,* the Government re-raises the same issue, the role of investment-backed expectations in regulatory takings law (discussed in detail *infra* ), that it places before the panel.

In addition, the Government raises two other issues for consideration by the court *en banc.* The first issue is whether the Government's invocation of the navigational servitude as a defense (in reference to regulation of a piece of land to which the servitude properly applies) provides an absolute defense regardless of the facts underlying the alleged purpose for the regulatory imposition, or whether the Government can be challenged to establish that it had a bona fide navigational purpose. As noted, the earlier opinion of this court held the latter. The second issue the Government raises is whether the panel correctly held that, for its takings analysis, the property at issue was the 50.7 acres, rather than the original 311 acre parcel once owned by the plaintiffs. Both of these issues were fully dealt with in our earlier opinion; since the Government's petition presents no new matter regarding them, further comment by the panel is not warranted. They will be referred to the *en banc* court in due course.

The main issue presented in the petition for rehearing, and the one addressed initially to the panel, is whether the court failed to follow its own controlling precedent when it stated that, if a taking is "categorical," that determination removes from the analytical equation the question of investment-backed expectations. In its original opinion, the panel, assuming that the law on this point was already well established, and quoting from the court's earlier opinion in *Florida Rock Industries*

*v. United States,* 18 F.3d 1560 (Fed.Cir. 1994), stated in summary fashion "that '[i]f a regulation categorically prohibits *all* economically viable use of the land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking.'" *Palm Beach Isles,* 208 F.3d at 1379 (quoting *Florida Rock,* 18 F.3d at 1564–65). In a footnote we observed that subsequent statements in opinions by this court could not change the law, and mentioned *Good v. United States,* 189 F.3d 1355, 1361 (Fed.Cir.1999) by name. *See id.* at 1379 n. 3. We went on to note that, of course, the statement in *Florida Rock* was subject to the Government's nuisance defense preserved for it by the Supreme Court in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

A "categorical" taking is, by accepted convention, one in which *all* economically viable use, i.e., all economic value, has been taken by the regulatory imposition. Such a taking is distinct from a taking that is the consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use. In the original opinion in this case, the court, following what it believed to be established law, treated the categorical regulatory taking for purposes of the case before it as akin to a physical taking. In a physical taking context, the question is not why the owner acquired the property taken, but only did she own it at the time of the taking. Questions of whether the owner had reasonable investment-backed expectations at the time the property was first acquired are simply not part of the analysis.

The Government points to the contrary statement in *Good* that "reasonable investment-backed expectations are an element

of every regulatory takings case." *Id.* The Government argues that on this issue *Florida Rock* is not controlling, that the statement in *Good* is consistent with the prior law of this court, specifically *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994), and therefore the panel in this case was bound to follow *Loveladies Harbor* and *Good* unless and until the court determines otherwise *en banc.*

The Government's position in this, and in its other arguments, is variously supported by amicus briefs from the Community Rights Counsel and from the Environmental Policy Project of Georgetown University Law Center on behalf of the Florida Audubon Society. Since the Government has made this issue its central ground for relief, and since there seems to be doubt in the minds of others, we grant the Government's petition for rehearing by the panel for the purpose of adding this Order as an addendum to the original opinion of the court; in all other respects the opinion and judgment of the court is reaffirmed.

### 2.

The Government places much weight on this court's earlier opinion in *Loveladies Harbor,* stating that "*Good* 's carefully-reasoned holding follows directly from this Court's analysis in *Loveladies.*" The "holding" referred to by the Government is the above-quoted statement in *Good* that "reasonable investment-backed expectations are an element of every regulatory takings case." Since the Government's position is premised on our *Loveladies Harbor* decision, we examine that case first.

*Loveladies Harbor,* as does this case, involved a categorical taking. The issue in *Loveladies Harbor* was the proper application of the Supreme Court's *Penn Central* test, the established analytical test for regulatory takings, to determine whether the trial court was correct that a taking had occurred. *See Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). As we explained in the *Loveladies Harbor* opinion,

the original *Penn Central* test set out three criteria for determining whether a regulatory taking had occurred: (1) Was there a denial of economically viable use of the property as a result of the regulatory imposition? (2) Were there investment-backed expectations? (3) What was the right balance between private rights and government need? *See Loveladies Harbor,* 28 F.3d at 1176–77 (citing *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646).

Between the time the trial court rendered its decision in *Loveladies Harbor,* decided on the basis of these three original *Penn Central* criteria, and the time the case was before us on appeal, the Supreme Court handed down its seminal opinion in the case of *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas,* the Court, among other things, redefined the third *Penn Central* criterion, the balancing step. The *Loveladies Harbor* appeal presented us with the task of clarifying how *Lucas* impacted on the three-part *Penn Central* test, and of applying the revised test to the case at hand. To do this, we set out the three criteria from *Penn Central,* re-stated the criteria with the *Lucas* gloss, and decided the case accordingly.

In *Loveladies Harbor* our concern was with the third of the Penn Central criteria, and to a lesser extent the first. As we noted in the opinion, on the facts before us there was no need to address the second criterion, investment-backed expectations, since the parties appeared to be in agreement regarding that issue. *See* 28 F.3d at 1179. After making note of that fact, we specifically pointed out that "there is less agreement between the parties with regard to the first and third criteria." *Id.* Application of the first criterion, the question of denial of economically viable use, turned on the so-called denominator issue. *See id.* at 1179–82. With regard to the application of the third criterion, the critical issue in the case, we were required to substitute the new *Lucas*-created nuisance

law defense for the original *Penn Central* balancing requirement. *See id.* at 1182–83

The opinion in *Loveladies Harbor* contains an extensive examination of the first and third criteria and their application to the facts of the case. It is clear from a careful reading of *Loveladies Harbor* that the references to investment-backed expectations in the discussion of the three *Penn Central* criteria, as they were stated both before and after *Lucas*, was for completeness. This court's focus was, first, on the denominator question, which decided the issue of whether there had been a sufficient denial of economically viable use, and, second and most importantly, on the "sea change" in takings law brought about by *Lucas*, which "dramatically change[d] the third criterion, from one in which courts ... were called upon to make ad hoc balancing decisions ... to one in which state property law, incorporating common law nuisance doctrine, controls." *Id.* at 1179.

With regard to the question now before us—are investment-backed expectations a part of *every* regulatory takings case, even categorical takings cases—that was not an issue squarely presented to the court in *Loveladies Harbor*, nor was it addressed or necessary to the decision there. It would be improper to read into the opinion in *Loveladies Harbor* a decision on a question of such importance that was not consciously addressed by the court.

The question was addressed, however, in the case that preceded *Loveladies Harbor* that year, *Florida Rock*, and it is to that case that we now turn. *Florida Rock* contains the statement, quoted in the original opinion in this case and set out above, to the effect that when there has been a prohibition of all economically viable use of land, there is, without more, a compensable taking. *See Florida Rock*, 18 F.3d at 1564–65. Read in context, that statement clearly means that a categorical taking is akin to a physical taking, and the reasons why the owner acquired the property are not a relevant part of the taking analysis.

However, the Government is correct in noting that in *Florida Rock*, the issue again was not squarely before the court. Though the trial court found a categorical taking, on appeal we considered the case to raise the question of a partial taking. Since the case was not treated by us as a categorical taking, the language from *Florida Rock*, that when there has been a categorical regulatory taking there is, without more, a compensable taking just as if it had been a physical taking, must be considered non-binding dictum.

The Government's brief seeking rehearing concerned itself with *Loveladies Harbor* and *Florida Rock*. There have been several other cases in this court since *Florida Rock* and *Loveladies Harbor* that are relevant to the issue, but were not discussed by the Government in its brief. In *Creppel v. United States*, 41 F.3d 627 (Fed.Cir.1994), the issue was whether the statute of limitations barred the takings claim. In its discussion of the three *Penn Central* criteria for determining when a taking occurs, the court noted that "[t]his dichotomy [between mere diminution and a partial taking] does not arise where a regulation removes all economically viable use of the property. Removal of all use indicates a fully compensable 'categorical taking' of the property." *Id.* at 631–32 (citing *Lucas* and *Florida Rock*).

In *Avenal v. United States*, 100 F.3d 933 (Fed.Cir.1996), the issue was whether a government freshwater diversion project that impacted on the plaintiffs' oyster beds created a compensable taking. The trial court held that plaintiffs had no protected property rights in their state-granted oyster bed leases. We concluded that the oyster bed leases did constitute "property" under the Fifth Amendment, but that plaintiffs knew when they acquired the leases that their rights to use the bottomlands for oystering were subject to the inevitable changes that the long-anticipated government project would bring about. *See id.* at 936–38. In short, they did not

have reasonable investment-backed expectations. *See id.* at 937.

We noted in the opinion that the record established that the government project had substantially reduced the value of plaintiffs' property "well beyond the level of 'mere diminution,'" the assumption being that there was probably at least a partial taking. *See id.* at 937. Nowhere was the taking described as "categorical." The plaintiffs retained the use of their leaseholds; it was not the plaintiffs who were ousted by the government project, but the oysters. On these facts, we found no compensable taking by the Government.

Just as was the case with *Loveladies Harbor* and *Florida Rock*, neither *Creppel* nor *Avenal* decided the issue before us. In *Creppel*, though the court addressed the issue, the statement must be considered non-binding dictum, since it was not essential to a holding on the application of the statute of limitations. In *Avenal*, the court applied the second *Penn Central* criterion—investment-backed expectations—to a case not involving a categorical taking. That of course is correct. Ever since *Penn Central* it has been understood that having reasonable investment-backed expectations is, generally speaking, a part of a successful claim of regulatory taking, claims that typically involve something less than a total wipeout; the issue before us today is whether a categorical taking—the total wipeout situation—is an exception to that rule, or whether, as *Good* suggests, it is not.

We arrive then at the *Good* case. *See Good v. United States,* 189 F.3d 1355 (Fed. Cir.1999). Beginning about 1980, Mr. Good sought to build houses on a parcel of wetlands in the Florida keys. Over a period of some years, state and local permits were granted and denied, issued and reissued. In 1994, the Corps of Engineers finally denied the necessary federal permit.[1] Good sued, alleging a taking.

The trial court granted summary judgment for the Government. This court upheld the judgment. The court concluded that Good knew of the regulatory problems from the time he first acquired the property—in the 1973 sales contract the seller specifically noted that there would be problems in connection with obtaining state and federal permits for development. *See id.* at 1362. This court concluded that he did not have the kind of investment-backed expectations that would entitle him to a recovery against the United States. *See id.* at 1363.

For our purposes, the single most important fact in the case is that the case did not involve a categorical taking. The trial court expressly found that

> Contrary to plaintiff's contention, the ESA [Endangered Species Act, on which the final permit denial by the Corps of Engineers was based] does not require that his property be left in its natural state. Further, the FWS [U.S. Fish and Wildlife Service] restrictions on development imposed pursuant to the ESA do not deprive plaintiff's property of all economic value. The property retains value both for development, or for the sale of transferable development rights.

*Good v. United States,* 39 Fed. Cl. 81, 84 (1997). Nothing in this court's opinion in *Good* suggests any disagreement with these findings; in fact, the court repeated these findings in its opinion. *See Good,* 189 F.3d at 1359–60. *Good,* then, is the same as *Avenal,* a case in which there was less than a total wipeout as a result of the regulatory imposition, and thus a case in which all three of the *Penn Central* criteria are properly at issue. Indeed, the *Good* court at the end of its opinion refers to *Avenal* and concludes that "[h]ere, too, Appellant's lack of reasonable, investment-backed expectations defeats his takings claim as a matter of law." *Id.* at 1363.

1. For those interested in administrative and land use law, the facts in the *Good* case provide a classic study in the permitting process.

The discussion in the *Good* case that led to the court's dictum about investment-backed expectations being an element in every regulatory takings case was part of a broad, general discussion about the role of expectations. The discussion was apparently in response to Good's claim that, contrary to the trial court's factual determination, his was a case in which virtually all of the economic value was eliminated, and that *Loveladies Harbor* was wrong in holding that expectations applied to such cases, and should be reversed as contrary to *Lucas*.[2] The ensuing discussion in *Good* once again is dictum since the case does not turn on the application of expectations to a categorical taking.

### 3.

We are left then with a situation in which no decision by this court has authoritatively answered the question posed. What we have are two inconsistent statements, one in *Florida Rock*, cited in *Creppel* and quoted in our earlier opinion in this case, and the other in *Good.* The full statement in *Florida Rock* is:

> The recent Supreme Court decision in *Lucas* teaches that the economic impact factor alone may be determinative; in some circumstances, no balancing of factors is required. If a regulation categorically prohibits all economically beneficial use of land—destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking. If, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's "categorical" taking rule.

*Florida Rock,* 18 F.3d at 1564–65 (footnotes and citations omitted). The question is, which admitted dictum—that of *Florida Rock* or that of *Good* —accurately reflects

the Supreme Court's *Lucas* decision, and thus the current state of the law? For the answer to this question, we turn to *Lucas.*

The facts of *Lucas* are familiar to all those interested in takings law. Under its Beachfront Management Act, the State of South Carolina prevented Mr. Lucas from building on his beachfront property. The case was treated by all courts involved as a total wipeout of Lucas's investment in the property—what the U.S. Supreme Court in its opinion in the case called a "categorical" taking. The state trial court awarded Lucas over one million dollars on his takings claim against the state. The state supreme court reversed, holding that under the balancing test (the third criterion) of *Penn Central,* the state was not liable. The U.S. Supreme Court granted certiorari, and in turn reversed the state supreme court.

A major issue in the case was the application of the three criteria in the traditional *Penn Central* analysis, in particular the third, which called for balancing private rights against state needs. As discussed above, the decision in *Lucas* dramatically changed this third criterion. But to ignore the impact of *Lucas* on other aspects of takings law is to deny the authority of the Supreme Court to develop further the parameters of the jurisprudence.

In its introductory discussion of the takings issue, the Court stated that its precedents

> described at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property ... no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation.... The second situation in which we have found

---

**2.** Apparently counsel in *Good* gave *Loveladies Harbor* the same erroneous reading that the

Government does in this case.

**1362**

categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.

*Lucas,* 505 U.S. at 1015, 112 S.Ct. 2886. The court then discussed at length the rationale behind the justification for the rule that a total deprivation of beneficial use by regulatory imposition was akin to a physical taking:

> We have never set forth the justification for this rule. Perhaps it is simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. *See San Diego Gas & Electric Co. v. San Diego,* 450 U.S. [621,] 652, 101 S.Ct. 1287, 67 L.Ed.2d 551 [ (1981) ] (dissenting opinion).... Surely, at least, in the extraordinary circumstance when no productive or economically beneficial use of land is permitted, it is less realistic to indulge our usual assumption that the legislature is simply "adjusting the benefits and burdens of economic life," *Penn Central Transportation Co.,* 438 U.S. at 124[, 98 S.Ct. 2646], in a manner that secures an "average reciprocity of advantage" to everyone concerned, *Pennsylvania Coal Co. v. Mahon,* 260 U.S. [393,] 415, 43 S.Ct. 158, 67 L.Ed. 322 [ (1922) ]. And the functional basis for permitting the government, by regulation, to affect property values without compensation—that "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *id.* at 413, 43 S.Ct. 158—does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.

*Lucas,* 505 U.S. at 1017–18, 112 S.Ct. 2886.

Though initially this discussion was related to the public interest balancing test, the issue the court was then addressing, the court repeated the joinder of these two "discrete categories," and the same treatment to be accorded them, in a variety of contexts throughout the opinion. *See, e.g., id.* at 1019, 112 S.Ct. 2886 ("We think, in

short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."); *id.* at 1027, 112 S.Ct. 2886 ("Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with."); *id.* at 1029, 112 S.Ct. 2886 ("Where 'permanent physical occupation' of land is concerned, we have refused to allow the government to decree it anew (without compensation).... We believe similar treatment must be accorded confiscatory regulations, i.e., regulations that prohibit all economically beneficial use of land ...."); *id.* at 1030, 112 S.Ct. 2886 ("[W]hen, however, a regulation that declares 'off-limits' all economically productive or beneficial uses of land goes beyond what the relevant background principles would dictate, compensation must be paid to sustain it.").

The Court's opening discussion in its *Lucas* opinion cited and referred to the leading takings law cases, including the *Penn Central* case. Had the court intended to make analysis of a categorical regulatory taking different from the categorical physical taking, for example regarding the question of investment-backed expectations, surely somewhere in the opinion there would be a hint of it. There is not. The Court well understood that, in takings law involving a "physical" taking of land by the government, the reason the owner acquired the land in the first instance is of no concern; that is, the owner's investment-backed expectations, or lack of them, are not a consideration. In light of the Court's repeated juxtaposition of physical takings with "categorical" regulatory takings, and the Court's repeated unqualified statements that the latter deserve the same compensation without more, we can

only conclude that the Court's purpose was to convey the principle that, when there is a physical taking of land, or a regulatory taking that constitutes a total wipeout, investment-backed expectations play no role.

For reasons of its own choosing, the Government in its petition for rehearing left unaddressed the role of the Supreme Court's *Lucas* decision in the determination of this question. The only reference to *Lucas* in the entire brief appears in a footnote on p. 6, where the Government offers the following: "As *Loveladies* and *Good* both recognized, *Lucas* does not resolve this issue. *Loveladies* noted that *Lucas* was relevant not to whether there had to be a reasonable investment-backed expectation, but only to the means by which courts are to evaluate the nature of the property at issue in the case." Whatever that last may mean, it reflects the Government's mistaken assumption that *Loveladies Harbor* had definitively addressed and decided the expectations issue.[3]

■ The rationale behind asking about investment-backed expectations in the typical case of a regulatory imposition (for example, barring gasoline stations from an area zoned for residential uses) is not difficult to understand. The purchaser who buys a parcel with a known and valid regulatory restriction on certain uses cannot complain that she thereafter sustains an economic loss when the restriction is enforced. If the purchaser paid more than the property with the restriction on it is worth, the loss is the result of an error in market judgment, not a result of the restriction as such. In the parlance of takings law, the purchaser does not have reasonable expectations that the property can be used for the prohibited purpose; to assess the government for such a loss is to give the purchaser a windfall to which she is not entitled.

■ A different case arises when government, though purporting to regulate the uses of a property, in fact imposes restrictions that have the same effect as a physical seizure and occupation for public purposes—leaving the owner with essentially no viable economic uses whatever and no rights except bare legal title. A purchaser who pays a substantial price for a parcel can be assumed to have expectations that the parcel can be used for some lawful purpose. When government seizes the entire estate for government purposes, whether by physical occupation or categorical regulatory taking, it is not necessary to explore what those expectations may have been. The purchaser may have had no particular expectations regarding immediate use, but only purchased for longterm investment. Or the purchaser's expectations may have been wholly unrealistic, and she may have paid more than the property is worth. It matters not. The Government is not obligated to pay for her expectations, but only to pay for the property interest taken. The Government's cost for the taking—the just compensation the Constitution imposes—is measured by the fair market value of the parcel, not the owner's hopes regarding its use. *See generally* 4 Julius Sackman, *Nichols on Eminent Domain* §§ 12.01–12C.03 (perm. ed. rev.vol.1999).

■ This does not mean that use restrictions are irrelevant to the takings calculus, even in categorical takings cases. Once a taking has been found, the use restrictions on the property are one of the factors that are taken into account in determining damages due the owner. *See id.* § 12C.03[1]. It does mean that in the initial analysis of whether a taking has occurred, when it is determined that the effect of the regulatory imposition is to eliminate all economic viability of the property alleged to have been taken, the own-

---

3. We note in passing that this same footnote pointedly observes that, "[n]otably, just three days after this panel's decision issued, the U.S. Supreme Court rejected a petition for certiorari in *Good* that was based, in part, on the assertion that *Good* was inconsistent with *Lucas* ...." We decline to believe that the Government by so noting wishes us to understand that a denial of certiorari has precedential value.

er's expectations regarding future use of the property are not a factor in deciding whether the imposition requires a remedy.[4]

As the Supreme Court noted, it is "the extraordinary circumstance when no productive or economically beneficial use of land is permitted...." *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886. This is because most land use restrictions do not deny the owner of the regulated property all economically viable uses of it. In the relatively few cases when they do, we have no doubt that both law and sound constitutional policy entitle the owner to just compensation without regard to the nature of the owner's initial investment-backed expectations.

■ In sum, we conclude that, in accord with *Lucas,* and not inconsistent with any prior holdings of this court, when a regulatory taking, properly determined to be "categorical," is found to have occurred, the property owner is entitled to a recovery without regard to consideration of investment-backed expectations. In such a case, "reasonable investment-backed expectations" are not a proper part of the analysis, just as they are not in physical takings cases. The statement in the original opinion in this case to that effect is a correct statement of the law. The right to recovery is of course subject to the government's defenses under the general rubric of nuisance enunciated in *Lucas* and explained in *Loveladies Harbor,* and as further explained in the original opinion in this case.

4.

The Government in its petition for rehearing complains that the panel "seriously erred in concluding that the appropriate parcel for analysis was the 50.7 acres of submerged lands and wetlands rather than the entire 311–acre parcel...." As we noted at the beginning of this Order, we

have no doubt that the relevant parcel for analysis is not the entire 311–acre parcel first purchased in 1956, but a subset of that parcel. The subset we defined in the original opinion—the 50.7 acres—consists of 49.3 acres of submerged lands, and 1.4 acres of adjacent uplands, described as wetlands. We concluded in the original opinion that, based on the trial court's findings, these two tracts should be treated together.

However, the wetlands are essentially upland property, and are not subject to the Government's defenses under the navigational servitude. Accordingly, the 1.4 acres should be analyzed separately. In her summary judgment order, the trial court concluded that there had not been a taking of the 1.4 acres on three grounds. First, the court determined that the relevant parcel was the entire 311 acres, and that therefore the 1.4 acres was subsumed within it. As we have held, that finding is erroneous. Second, the trial court held that PBIA knew when it bought the property that it would need permits to develop the land, and thus the existing statutory regime precluded any reasonable investment-backed expectation of being able to develop the property. And third, the court found that while the 1.4 acre section by itself is insufficient for building homes, PBIA had not established that all other uses were foreclosed.

■ On the second point, the record suggests that PBIA may well have had investment-backed expectations for the 1.4 acres, since shortly after purchasing the property in 1957 they were able to obtain dredge and fill permits from the Corps of Engineers. The existence of a regulatory regime does not per se preclude all investment-backed expectations for development. The difficulty with the third point is that it involves a disputed question of

---

4. We observe in passing that, at least in some cases, the dollar outcome may not be all that different whether under the *Lucas* regime of not factoring expectations into the categorical taking analysis but recognizing that the understood regulatory regime may be a damages

consideration, or under the Government's preferred regime of making it a part of every regulatory takings cause of action. Though that seems theoretically plausible, we would not speculate regarding to which cases that observation might apply.

fact—what uses are left for the tract after the permit denial—and the case was decided on summary judgment.

■ On further review, then, we conclude that the proper disposition of the issue regarding the 1.4 acres is to remand the question of a taking to the trial court. If the trial court determines that the permit denial constituted a categorical taking of the 1.4 acre tract, then, absent any other defenses the Government may have, PBIA is entitled to compensation as if it were a physical taking for government purposes. If the trial court determines that, on the facts, the permit denial constituted less than a total wipeout of economically viable use, the court must then determine if there is a partial taking, applying the *Penn Central* criteria (as modified by *Lucas* —see this court's explanation in *Loveladies Harbor* ; *see also Florida Rock* ).

## CONCLUSION

This Order constitutes the panel's action in response to the Government's petition for rehearing. The case is remanded to the trial court to conduct the proceedings as instructed in the original opinion of the court issued on March 31, 2000, and in addition to make the determinations contained in this Order. In all other respects the opinion and judgment of the court issued on March 31, 2000, is re-affirmed.