Anthony **PALAZZOLO**

v.

**STATE of Rhode Island, by and through its General Treasurer, Paul J. TAVARES, et al.**

No. 98–333–Appeal.

Supreme Court of Rhode Island.

Feb. 25, 2000.

John B. Webster, Warwick, for Plaintiff.

Michael L. Rubin, Brian A. Goldman, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

Anthony Palazzolo (Palazzolo) brought an inverse condemnation action against the Coastal Resources Management Council (CRMC), alleging that the CRMC's denial of his application to fill eighteen acres of coastal wetlands constituted a taking of his property for which he was entitled to compensation pursuant to the United States and Rhode Island Constitutions. After a trial justice found that the denial of Palazzolo's application was not a taking for which compensation was owed, judgment was entered for the CRMC, and Palazzolo timely appealed to this Court. It is our conclusion that this case is not ripe for judicial review and that the trial justice did not err in granting judgment to the CRMC.

### Facts and Procedural History

Palazzolo has been president of Shore Gardens, Incorporated (SGI), a Rhode Island corporation, from the time of its incorporation on July 29, 1959. On December 2, 1959, Palazzolo, Natale Urso (Urso), and Elizabeth Urso transferred three adjoining parcels of land in the Town of Westerly, Rhode Island, (town) to SGI. The parcels are located between the northern side of Atlantic Avenue and the southern shore of Winnipaug Pond. In 1936, an earlier owner had subdivided that portion of the land lying along Atlantic Avenue, leaving the remainder as an undivided lot. In 1959, SGI submitted to the town a new plat subdividing the entire property into eighty lots. At the time, Palazzolo and Urso were the sole shareholders in SGI.

Between 1959 and 1961, SGI transferred for consideration eleven of the lots to various grantees. These lots were apparently in the upland area of the parcel and could be built upon with little alteration to the land. In 1960, Urso transferred his interest in SGI to Palazzolo, and Palazzolo became the sole shareholder. In 1969, five of the previously sold lots were reacquired by SGI. After this transaction, SGI was the record owner of seventy-four of the original eighty lots. Although SGI's corporate charter was revoked by the Rhode Island Secretary of State on February 27, 1978, SGI remains the record owner, and all taxes on the property are assessed to SGI.

The property consists primarily of coastal wetlands and marshlands.[1] Some of the lots laid out in the subdivision plat include a substantial amount of land that is under the waters of Winnipaug Pond. Additional land that is not permanently under water is subject to daily tidal inundation, and "ponding" in small pools occurs throughout the wetlands. The area serves as a refuge and feeding ground for fish, shellfish, and birds, provides a buffer for flooding, and absorbs and filters run-off into the pond.

Between 1962 and 1985, Palazzolo filed several applications with state agencies seeking permission to substantially alter the property. During the same period, state regulations governing alterations to coastal wetlands changed substantially.

On March 29, 1962, Palazzolo submitted an application to the Division of Harbors and Rivers (DHR) of the Department of Natural Resources (DNR)[2] to dredge the pond and use the dredge to fill the subject property. This application was returned to Palazzolo by DHR because it lacked essential information. On May 16, 1963, Palazzolo filed an application seeking approval to build a bulkhead, to dredge the pond, and to fill the property. At the time of these two applications, there was no statutory requirement that any state agency approve the filling of coastal wetlands, but a party wishing to dredge a river or pond was required to gain approval of DHR.[3]

In 1965, the Legislature adopted an act on inter-tidal wetlands protection that gave DNR[4] the authority to restrict filling in coastal wetlands. P.L.1965, ch. 140, § 1, codified as G.L.1956 §§ 2–1–13 through 2–1–17.[5] On April 29, 1966, Palazzolo applied for DHR approval to dredge the pond and fill the tidal marshlands so he could construct a recreational beach facility, and on April 1, 1971, DHR issued a decision approving the applications and giving Palazzolo the option of either constructing a bulkhead and filling the marsh or constructing a beach facility. On November 17, 1971, DHR revoked its assent, and this revocation was not appealed.

In 1971, the Legislature enacted the Coastal Resources Management Council

1. The exact size of the entire parcel has not been specified by the parties. It is undisputed that the property comprises approximately eighteen acres of wetland, and it appears that there are no more than a few additional upland acres.

2. At the time of Palazzolo's 1962 and 1963 applications, DHR was part of the Department of Public Works. In 1965, however, the Legislature transferred DHR to the newly-created DNR. P.L.1965, ch. 137, § 1. For purposes of clarity, we will refer to DNR throughout this opinion.

3. Neither party has identified any statutory provision that required DHR approval before a pond or river could be dredged, although both parties agreed that Palazzolo was re-

quired to seek such approval. We will assume that DHR had authority to consider these applications, although the question is purely of historical interest at this point.

4. This act ostensibly gave authority over coastal wetlands to the Department of Agriculture and Conservation. P.L.1965, ch. 140, § 1. Nearly simultaneously, however, the Legislature transferred all of the functions, powers, and duties of the Department of Agriculture and Conservation to DNR. P.L.1965, ch. 137, § 1.

5. This act was repealed in 1990. P.L.1990, ch. 461, § 9. Well before this repeal, the state had delegated authority over coastal wetlands to the CRMC.

enabling act, P.L. 1971, ch. 279, § 1, codified as G.L. 1956 chapter 23 of title 46, which created the CRMC and gave the CRMC authority to regulate coastal wetlands. In 1977, the CRMC promulgated a set of regulations—the Coastal Resources Management Program—that prohibited the filling of coastal wetlands without a special exception from the CRMC.

In March 1983, Palazzolo filed an application with the CRMC seeking approval to construct a bulkhead on the shore of the pond and fill approximately eighteen acres of salt marsh. That application, nearly identical to the application submitted in 1963, was rejected by the CRMC. Palazzolo did not appeal that decision. In January 1985, Palazzolo filed an application to fill wetlands on the property, again so he could create a recreational beach facility. This application, nearly identical to the 1966 application, was denied by the CRMC on February 18, 1986. Palazzolo appealed this denial pursuant to G.L.1956 § 42–35–15, and that appeal was denied by a justice of the Superior Court. *Palazzolo v. Coastal Resources Management Council,* 1995 WL 941370 (R.I.Super., Jan.5, 1995) (C.A. No. 86–1496) (Israel, J.).

While Palazzolo's appeal of the 1986 CRMC decision was proceeding, he filed the instant action alleging that the CRMC's denial of his application constituted a taking of his property without just compensation, in violation of the Fifth Amendment to the United States Constitution and article 1, section 16, of the Rhode Island Constitution. Palazzolo sought damages in the amount of $3,150,000, based on the profits he claimed he would receive from filling the wetlands and developing the property as seventy-four lots for single-family homes. A jury-waived trial was held in June 1997, and on October 24, 1997, the trial justice issued a thirteen-page decision that made findings of fact and law. The trial justice concluded that Palazzolo's property had not been taken for public use and that no compensation was required under the United States or Rhode Island Constitutions. Palazzolo timely appealed, asking this Court to review the trial justice's findings of fact and law.

Additional facts will be discussed as required by analysis of the legal issues presented.

### Standard of Review

■ Palazzolo's appeal seeks review of the findings of law and the findings of fact made by the trial justice in his decision. A trial justice's findings on questions of law are reviewed *de novo* by this Court. *See, e.g., Nonnenmacher v. City of Warwick,* 722 A.2d 1199, 1202 (R.I.1999) (the existence of a contract is a question of law reviewed *de novo* by the Court); *Levine v. Bess Eaton Donut Flour Co.,* 705 A.2d 980, 982 (R.I.1998) (statutory interpretation is a question of law that the Court reviews *de novo* ).

■ Findings of fact by a trial justice sitting without a jury, however, are accorded great weight upon review by this Court, and those factual determinations "will not be disturbed unless the justice has overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Collins,* 679 A.2d 862, 865 (R.I.1996).

■ A trial justice's findings on mixed questions of law and fact are generally entitled to the same deference as the justice's findings of fact. *Hawkins v. Town of Foster,* 708 A.2d 178, 182 (R.I.1998). But, when those mixed questions of law and fact impact constitutional matters, we shall review the findings *de novo,* pursuant to *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *See Foley v. Osborne Court Condominium,* 724 A.2d 436, 439 (R.I.1999) (applying the *Ornelas* standard to a civil case); *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997) (applying the *Ornelas* standard to a criminal case).

## Takings Analysis

Palazzolo's claim for damages is grounded in the Fifth Amendment to the United States Constitution, which bars the taking of private property for public use, without just compensation. This prohibition on uncompensated taking has been applied to the states through the Fourteenth Amendment. *San Diego Gas & Electric Co. v. City of San Diego*, 450 U.S. 621, 623 n. 1, 101 S.Ct. 1287, 1289 n. 1, 67 L.Ed.2d 551, 555 n. 1 (1981). Similarly, article 1, section 16, of the Rhode Island Constitution provides that "[p]rivate property shall not be taken for public uses, without just compensation." The United States Supreme Court has recognized that this constitutional injunction is "designed to bar [g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960).

Historically, a taking was recognized when the government confiscated a piece of real property for some public purpose, such as constructing a road. *See, e.g., Central Land Co. v. City of Providence*, 15 R.I. 246, 250, 2 A. 553, 556 (1886) (city required to give compensation for land taken to widen road). The United States Supreme Court has also recognized, however, "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922). The question of whether a specific governmental regulation of property has gone too far, however, has not been an easy one to resolve. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123–28, 98 S.Ct. 2646, 2658–61, 57 L.Ed.2d 631, 647–51 (1978) (discussing the difficulties in developing a "set formula" to analyze regulatory takings claims). Fortunately, recent decisions of the Supreme Court have identified a three-step process that can be used in analyzing Palazzolo's regulatory takings claim.

■ First, a court confronted with a claim that a government regulation effects a taking of property must determine whether the claim is ripe for judicial review.' *See, e.g., MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 351–52, 106 S.Ct. 2561, 2567–68, 91 L.Ed.2d 285, 295–97 (1986) (court should not reach the merits of a takings claim if the claim is premature); *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126, 139 (1985) (judicial action on a takings claim is not supportable when the claim is not ripe). The United States Supreme Court in *Williamson County* has stated that a regulatory takings claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.*

■ Second, if the claim is ripe, the reviewing court must then determine whether the government regulation falls into one of the two categories that the Supreme Court has identified as *per se* takings. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812–13 (1992). The first of these is any regulation that compels a property owner to suffer a physical invasion of his or her property. *Id.* at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812. *See also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–40, 102 S.Ct. 3164, 3175–78, 73 L.Ed.2d 868, 882–85 (1982) (regulation requiring building owner to permit cable television company to install equipment on the exterior of the building was a compensable taking, regardless of the size of the equipment). The second category of *per se* takings occurs when the regulation at issue "denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 813. *See*

*also Annicelli v. Town of South Kingstown,* 463 A.2d 133, 140 (R.I.1983) (town was required to compensate landowner after designating property as being in "high flood danger" district, because the designation left owner with no beneficial use of the property). Hence, when government action constitutes either a physical invasion of property or a denial of all beneficial use, the owner of the property must be compensated regardless of the public interest advanced in support of the action. *Lucas,* 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812.

▮ Finally, when a regulation does not amount to a *per se* taking, the reviewing court must determine whether it meets the test for a regulatory taking established in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. This test requires an *ad hoc* factual inquiry in which the court should examine three factors. *Id.* First, what is the character of the government action? *Id.* Second, what is the economic impact of the action? *Id.* Third, to what extent has the regulation interfered with distinct investment-backed expectations of the owner? *Id. See also Alegria v. Keeney,* 687 A.2d 1249, 1252 (R.I.1997) (applying the *Penn Central* test).

In our review, we begin by applying this three-step analysis to evaluate Palazzolo's claim that the CRMC's denial of his application to fill his property amounts to a compensable taking. We first discuss the necessary question of whether the claim is ripe for judicial review.

### Ripeness

▮ The requirement of ripeness is based on the principle that this Court "will not render advisory opinions or function in the abstract." *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 28, 317 A.2d 124, 130–31 (1974). The United States Supreme Court discussed the basic rationale of the ripeness doctrine in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d

681, 691 (1967), in which the Court explained that unless administrative decisions resulted in cases that were ripe for judicial resolution, courts would become enmeshed in "abstract disagreements" concerning administrative policies. *See also Barrington School Committee v. Rhode Island State Labor Relations Board,* 608 A.2d 1126, 1131 (R.I.1992) ("[t]he need for exhaustion to attain ripeness allows an agency to correct its own errors, perhaps thereby avoiding the necessity of any judicial involvement"). A case is ripe for review only when there is an allegation of an injury in fact and when the claims that are made are capable of proof at trial. *Cannon,* 113 R.I. at 28, 317 A.2d at 130–31. *See also In re Petition of Almond,* 603 A.2d 1087, 1090 (R.I.1992) (petition regarding potential conflict between state and federal rules governing prosecutors' conduct was not ripe for review where the federal court had adopted the state rule, because federal prosecutors would face injury only if federal court abandoned state rule); *Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 915 n. 2 (R.I.1991) (case was ripe for review when there was actual conflict between statute and collective bargaining agreement).

The concept of ripeness looms large in the jurisprudence of takings because for a court to determine whether a taking has occurred, the court must be able to ascertain "the nature and extent of permitted development" on the subject property. *MacDonald, Sommer & Frates,* 477 U.S. at 351, 106 S.Ct. at 2567, 91 L.Ed.2d at 295. Thus, a claim was found not to be ripe when the claimants had not submitted a plan for development of the property. *See Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 111 (1980) (owners alleged that zoning change was a taking, but had not sought permission to develop the land). Similarly, claims were deemed unripe when the claimants had submitted only a single grandiose plan for development and had

not demonstrated that less ambitious plans also would be rejected. *See MacDonald, Sommer & Frates,* 477 U.S. at 353 n. 9, 106 S.Ct. at 2568 n. 9, 91 L.Ed.2d at 297 n. 9 (owner only had sought approval for a 159–lot development and did not explore options for less intensive development); *Penn Central,* 438 U.S. at 136–37, 98 S.Ct. at 2665–66, 57 L.Ed.2d at 656 (owner had only sought approval to build fifty-story building above train terminal and did not demonstrate that permission would be denied for smaller structure); *Alegria,* 687 A.2d at 1253 (claimant filed application to construct four buildings in wetlands, but never sought approval for construction of fewer buildings).

■ On the basis of our *de novo* review of the record and of the trial justice's decision, it is our determination that Palazzolo's claim for compensation was not ripe for review. This holding is derived from two crucial facts. First, although Palazzolo claimed that his property was taken when he was denied permission to develop a seventy-four-lot subdivision, he never applied for permission to develop such a subdivision. His 1966 and 1985 applications sought to fill the wetlands so he could construct a beach club. His 1963 and 1983 applications sought permission to fill the wetlands, with no statement describing what he intended to do with the land when it was filled. In fact, during the hearings on the 1983 application, he specifically stated that he had no plans to build on the filled land. Because Palazzolo has not applied for permission to develop a seventy-four-lot subdivision, he has not received a "final decision regarding the application of the regulations to the property at issue."

*Williamson County,* 473 U.S. at 186, 105 S.Ct. at 3116, 87 L.Ed.2d at 139.

■ Our conclusion that Palazzolo's claim is not ripe for judicial resolution also rests on the fact that he has not sought permission for less ambitious development plans. His 1963 and 1983 applications sought permission to fill the entire eighteen acres of wetlands. His 1966 and 1985 applications to develop a private beach club sought permission to fill all of the wetlands except for a fifty-foot strip between the fill and the pond. Palazzolo has not sought permission for any other use of the property that would involve filling substantially less wetlands or that would involve development only of the upland portion of the parcel. There was undisputed evidence in the record that it would be possible to build at least one single-family home on the existing upland area, with no need for additional fill. Until Palazzolo has explored development options less grandiose than filling eighteen acres of salt marsh, he cannot maintain a claim that the CRMC has deprived him of all beneficial use of the property.[6]

Because Palazzolo's regulatory takings claim was not ripe for judicial review, the trial justice properly entered judgment in favor of the CRMC. Although our determination that the claim was not ripe is dispositive of the case, we shall briefly discuss the merits of Palazzolo's claim.

### Deprivation of All Beneficial Use

■ The trial justice properly began his consideration of Palazzolo's claim by examining whether there had been a *per se* taking under the rubric of *Lucas.* Because both parties acknowledged that the

---

**6.** This holding leads to the self-evident conclusion that a landowner who is denied regulatory approval to use his or her property in a particular way must file additional applications seeking permission for less ambitious uses before a takings claim may be sustained. We emphasize, however, that those subsequent applications must be substantially different from the original application. In the case at bar, Palazzolo repeatedly filed nearly identical applications to fill the wetlands, and appealed only one of the three denials of these applications. The doctrine of administrative finality dictates that an applicant may not challenge administrative action by filing identical repetitive applications, but must bring any challenge in Superior Court in accord with the Administrative Procedures Act, G.L. 1956 § 42–35–15.

regulations in question did not compel Palazzolo to suffer a physical invasion of his property, there could only be a *per se* taking if Palazzolo has been deprived of all beneficial and reasonable use of his land. The trial justice found that Palazzolo had not demonstrated such a deprivation. Based on our *de novo* review of the record, we agree.

Palazzolo presented evidence at trial indicating that he would not be granted permission to fill eighteen acres of wetlands on the subject property. There was undisputed evidence, however, that had he developed the upland portion of the land, its value would have been $200,000. Further, there was testimony that the wetlands would have value in the amount of $157,500 as an open-space gift. It is true that these sums are significantly lower than the speculative $3,150,000 profit that Palazzolo alleged he could earn from filling and developing the wetlands,[7] but "[t]he mere fact that [the landowner] may not have received the anticipated return on his investment does not render nugatory the remaining value of the land." *Alegria,* 687 A.2d at 1253. In the face of this evidence, the trial justice was not clearly wrong in finding that Palazzolo had not been deprived of all beneficial use of his property.

▮ Even if Palazzolo had been denied all beneficial use of his property, he would not be able to demonstrate a *per se* taking on the facts of this case. In *Lucas,* the Supreme Court noted that the government "may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his [or her] title to begin with." *Lucas,* 505 U.S. at 1027, 112 S.Ct. at 2899, 120 L.Ed.2d at 820. In applying this rule, the trial justice found that Palazzolo could not have become the owner of the property

before 1978, at which time the regulations limiting his ability to fill the wetlands were already in place. The trial justice thus determined that the right to fill the wetlands was not part of Palazzolo's estate to begin with, and that he was therefore not owed any compensation for the deprivation of that right. The trial justice's finding that Palazzolo did not acquire the parcel until 1978 is a mixed question of law and fact that does not implicate constitutional matters. We will not overturn that finding unless there was "clear error, oversight, or misconception of material evidence." *Hawkins,* 708 A.2d at 182. However, the trial justice's determination that a regulatory takings claim may not be maintained where the regulation predates the acquisition of the property is a question of law that we review *de novo.* In making these findings, the trial justice did not overlook or misconceive any material evidence, nor did he misapply the law.

During trial, the trial justice described the conveyance history of this parcel as "a title examiner's nightmare." The evidence was clear, however, that in 1959 the land was acquired by SGI, not Palazzolo. Further, all transactions since 1959 have been conducted and recorded in the name of SGI. During the time that SGI was a valid Rhode Island corporation, SGI was clearly the owner of this property, despite the fact that Palazzolo was SGI's sole shareholder for most of that time. *See Rhode Island Hospital Trust Co. v. Doughton,* 270 U.S. 69, 81, 46 S.Ct. 256, 258, 70 L.Ed. 475, 479 (1926) ("[t]he owner of the shares of stock in a company is not the owner of the corporation's property"). *See also Brotherton v. Department of Environmental Conservation,* 252 A.D.2d 498, 675 N.Y.S.2d 121, 122 (1998) (having "received the benefits of corporate ownership for many years * * * [claimant] may not now disregard the corporate form of ownership

---

7. It was revealed at oral argument that the town's current zoning law would not permit seventy-four lots to be developed on only eighteen acres. Further, there was no evidence that Palazzolo would be able to obtain the necessary permits for the installation near Winnipaug Pond of the number of septic systems that his proposed development would require. Thus, it is clear that his anticipated "profit" was unrealistically optimistic.

merely because it no longer serves his interests"); *City of Virginia Beach v. Bell,* 255 Va. 395, 498 S.E.2d 414, 418, *cert. denied,* 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998) (corporation, not stockholder, was owner of property for purposes of takings analysis). Palazzolo did not become the owner of the property until 1978 because only at the time the corporation's charter was revoked did the property pass by operation of law to Palazzolo, its sole shareholder. *Friendly Home v. Shareholders & Creditors of Royal Homestead Land Co.,* 477 A.2d 934, 938 (R.I. 1984). Thus, there was sufficient evidence to support the trial justice's finding that Palazzolo did not become the owner of the parcel until 1978.[8]

Palazzolo argued that if in fact he became deprived of all beneficial use of the land, then under *Lucas,* it is irrelevant *when* he became owner of the property. Under his reasoning, if a regulation deprives an owner of all beneficial use, it is immaterial whether the regulation predates the claimant's ownership of the land. However, Palazzolo was unable to cite a single case in which a court has ordered compensation for a regulatory taking when the claimant became the owner of the property *after* the regulation became effective. Not only is this argument unsupported by precedent, it is flawed. First, it violates the Supreme Court's dictate in *Lucas,* instructing reviewing courts to determine whether a landowner originally possessed the right to engage in a particular use. Here, when Palazzolo became the owner of this land in 1978, state laws and regulations already substantially limited his right to fill wetlands. Hence, the right to fill wetlands was not part of the title he acquired. *See Brotherton,* 675 N.Y.S.2d at 122–23 (takings claim failed because "[the landowner] failed to demonstrate that, at the time he acquired title, he possessed the right to develop and use the property in the manner which he proposes"); *City of Virginia Beach,* 498 S.E.2d at 417 (where the regulation predated the landowner's acquisition of the property, "the 'bundle of rights' which [the landowner] acquired upon obtaining title to the property did not include the right to develop the lots without restrictions").

Moreover, Palazzolo's argument that the time of acquisition is irrelevant could lead to pernicious "takings claims" based on speculative purchases in which an individual intentionally purchases land, the use of which is severely limited by environmental restrictions, and then seeks compensation from the state for that "taking." Additionally, regulatory takings would be treated differently from physical takings, a result that is clearly contrary to the *Lucas* Court's statement that the two types of takings should be accorded similar treatment by courts. *Lucas,* 505 U.S. at 1028–29, 112 S.Ct. at 2900, 120 L.Ed.2d at 821. For instance, under Palazzolo's interpretation, any new purchaser of land would be able to claim that a pre-existing regulation resulted in a taking for which that new owner was owed compensation. This is clearly different from the treatment given to physical takings, in which only the owner at the time of the taking is owed compensation. *See id.* (noting that "a permanent easement that was a pre-existing limitation upon the landowner's title" would not amount to a compensable taking). Regardless of whether the government physically takes property in the form of an easement or promulgates regulations restricting the property's use, all subsequent owners take the land subject to the pre-existing limitations and without

---

· **8.** Had SGI sought compensation for a taking during its ownership of the property, it would have been faced with the fact that it would not have been able to demonstrate deprivation of all beneficial use, because it had transferred eleven parcels for consideration during the first three years of its ownership. *See*

*Ciampitti v. United States,* 22 Cl.Ct. 310, 320 (1991) (in determining whether there had been deprivation of all beneficial use, court must "put into the equation not only those areas as to which dredge and fill permits were denied, but also those areas that had been successfully developed earlier").

the compensation owed to the original affected owner.

Thus, the record here provided sufficient evidence to support the trial justice's findings that Palazzolo had not been deprived of all beneficial use of his property and that he had no inherent development rights derived from any rights that existed prior to his acquiring title to the land in 1978. Therefore, there was no *per se* taking.

### Investment–Backed Expectations

 Having concluded that there was no *per se* taking, we must determine whether there was a regulatory taking under the test of *Penn Central*. The trial justice found that Palazzolo had no reasonable investment-backed expectations that were affected by this regulation and that therefore there was no taking. We agree. As we have discussed, the trial justice did not err in finding that Palazzolo did not become the owner of the land until 1978.[9] At that time, there were already regulations in place limiting Palazzolo's ability to fill the wetlands for development. In light of these regulations, Palazzolo could not reasonably have expected that he could fill the property and develop a seventy-four-lot subdivision. *See Good v. United States*, 189 F.3d 1355, 1361–62 (Fed.Cir. 1999), *petition for cert. filed*, 68 U.S.L.W. 3367 (U.S. Nov. 24, 1999) (No. 99–881) ("[i]n view of the regulatory climate that existed when [the landowner] acquired the subject property, [the landowner] could not have had a reasonable expectation that he would obtain approval to fill ten acres of wetlands in order to develop the land").

Palazzolo's lack of reasonable investment-backed expectations is dispositive in this case, and we need not consider the other factors of the *Penn Central* test. *Good*, 189 F.3d at 1363.

### Conclusion

In conclusion, therefore, Palazzolo's claim was not ripe for review, he has not demonstrated that he has been deprived of all beneficial use of his property, and he had no reasonable investment-backed expectations that he could develop a seventy-four-lot subdivision on this property. Therefore, the judgment of the Superior Court is affirmed, and Palazzolo's appeal is denied and dismissed. The papers of the case may be returned to the Superior Court.

---

9. During oral argument it was suggested that a party to whom property passes through operation of law could assume the investment-backed expectations of the original owner, and we were referred to the decision in *Reahard v. Lee County*, 968 F.2d 1131 (11th Cir.1992). The Eleventh Circuit in *Reahard* never decided the issue of whether the claimant, who had inherited the property from his parents, had any reasonable investment-backed expectations, *id.*, at 1136, and the action was ultimately dismissed for lack of ripeness. *Reahard v. Lee County*, 30 F.3d 1412, 1418 (11th Cir.1994).