DECISION
Before this Court is an appeal from a decision of the Zoning Board of Review of the Town of Middletown ("Board" or "Appellee"). In its decision, the Board upheld the issuance by the Building Officer of building permit # 2007-0659 to Michael J. Silveira ("Silveira"). The permit allowed construction of an eighty-foot by fifty-foot (80' x 50') outbuilding on Silveira's parcel, Lot 84-A, Assessor's Plat 117, located at 742 Jepson Lane ("Subject Property"). The appellant, abutter Barry Smith ("Smith" or "Appellant"), seeks reversal of the Board's decision. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
Appellant Barry Smith is a resident of the Town of Middletown, owning and residing in property at 768 Jepson Lane.
Michael J. Silveira is a resident of the Town of Middletown, owning and residing in the Subject Property at 742 Jepson Lane. Silveira is a named defendant as the owner of the Subject Property. *Page 2 
The Subject Property was previously owned by Jose Gomes ("Gomes"), who sought a variance to subdivide the property into two individual single-family lots, each of which exceeded the requirement of thirty thousand (30,000) square feet of developable land area. The variance would have allowed the subdivision despite the failure to meet the minimum one hundred thirty foot frontage requirement.
Gomes' application for subdivision was denied by the Middletown Planning Board ("Planning Board") on October 11, 2006, after which Gomes filed an appeal along with a petition for variance to the Zoning Board.
Gomes' appeal and application for variance were heard before the Board on April 24, 2007.
At that April 24, 2007 hearing, Gomes was represented by his attorney, David P. Martland, who made known to the Board conversations between Gomes and two abutters, Brian and Barry Smith. During those conversations, Gomes agreed to four conditions to the subdivision and variance, one of which was that Parcel A (which would become known as 742 Jepson Lane) would be utilized for a single-family house, and such accessory structures as were customary and incidental to the single-family use thereon.
The Board granted Gomes' appeal and application for variance in a written decision ("the Gomes Decision") dated June 27, 2007.
The Gomes Decision conditioned the Board's approval upon the four conditions agreed to by Gomes, including the condition that Parcel A would be restricted to a single-family house and accessory structures customary and incidental to the single-family house. *Page 3 
After the Gomes Decision, Lot 84-A, the Subject Property, was created. It is 1.69 acres in size and is located within the R-30 Zone, pursuant to the Middletown Zoning Code ("Zoning Code").
In December 2007, the new owner, Silveira, applied for and was issued a building permit, to construct a single-family residence with a three-car attached garage on the Subject Property. The permit was approved and issued by Middletown Building Official Jack Kane ("Kane"). Construction on that home and the attached garage commenced immediately.
The single family home, when completed, had six thousand (6000) square feet of living space, including the three-car attached garage. This square footage calculation did not take into account the square footage of the basement.
On December 28, 2007, Silveira applied for and received a building permit, #2007-0659, to construct an eighty-foot by fifty-foot (80' x 50') accessory structure on the Subject Property. The building permit was approved and issued by Kane.
In early February 2008, the site for the outbuilding was excavated and the concrete foundation poured.
Barry Smith was notified of the progress on the neighboring building by his brother Brian as early as March 2 or 3, 2008. Upon learning of the size of the foundation, Smith contacted Kane who informed Smith that the outbuilding was to be a garage.
Upon his return to Rhode Island, on or about March 14, 2008, Smith filed his Petition for Appeal with the Board, appealing the issuance of permit #2007-0659 as violative of the Zoning Code and the conditions placed upon the Subject Property pursuant to the Gomes Decision.[1] *Page 4 
The Board issued a public notice to abutters of a public hearing on the appeal to take place on April 22, 2008. The hearing subsequently took place on May 27, 2008.
Appellant Smith was represented by counsel, Kenneth Tremblay, while Silveira appeared pro se.
Smith testified at the hearing, as did John Silvia (real estate expert), Brian Smith (abutter and Appellant's brother), Richard Carrubba (licensed real estate appraiser), John Kane, Michael Silveira, Joseph Silveira (Silveira's father), and Paul Bongiovanni (abutter concerned with drainage).
At the conclusion of the hearing, the Board's five voting members unanimously voted to uphold the issuance of the permit for the outbuilding.
On July 23, 2008, the Board's written decision, memorializing the unanimous vote to uphold the issuance of the permit, was recorded with the Middletown Town Clerk's records ("the Smith Decision").
On August 6, 2008, Barry Smith, through his attorney, filed a Complaint with the Superior Court appealing the Smith Decision of the Board. This Complaint was filed within the required twenty (20) days per § 45-24-69(a). Additionally, he filed a Motion to Stay pending appeal per § 45-24-69(a).[2]
Notice of the appeal was sent to abutters within two hundred (200) feet of the Subject Property, and the Defendants were properly served with the Complaint. *Page 5 
On August 8, 2008, the Board answered the Complaint and objected to the Motion to Stay.[3]
On August 28, 2008, Jack Kane filed with this Court a complete copy of the record upon which the Board relied in making its decision in accord with § 45-24-69(a).
 Standard of Review
The Superior Court's review of a zoning board decision is governed by G.L. § 45-24-69(d), which provides that:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 . . . .
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record[.]"
When reviewing a decision of a zoning board, a justice of the Superior Court may "not substitute [his or her] judgment for that of the zoning board if [he or she] conscientiously find[s] that the board's decision was supported by substantial evidence."Apostolou v. Genovesi,120 R.I. 501, 507, 388 A.2d 821, 825 (1978). "Substantial evidence . . . means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means [an] amount more than a scintilla but less than a preponderance."Lischio v. Zoning Bd. of Review of N. Kingstown,818 A.2d 685, 960 n. 5 (R.I. 2003) (quoting Caswell v. GeorgeSherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). Essentially, the substantial evidence standard refers to the reasonableness of the action taken by the zoning board on the basis of the evidence before it. See Apostolou,120 R.I. at 508, 388 A.2d at 825. *Page 6 
While the reviewing court must give deference to the zoning board on questions of fact, questions of law are reviewed de novo.See Pawtucket Transfer Operations, LLC v. City ofPawtucket, 944 A.2d 855, 859 (R.I. 2008). The Superior Court shall act without a jury and it shall consider the record of the hearing before the zoning board of review.See § 45-24-69(c).
 Accessory Use
A key issue in this appeal is a question of law which this Court shall determine de novo: what constitutes a use accessory to a single-family residential dwelling? Specifically, the Appellant contends that size is an integral factor in determining whether a structure is accessory to the single-family residential dwelling at issue here, while Appellees argue that the proposed use is the yardstick by which accessory use status is legally measured.
The Rhode Island Zoning Enabling Act defines "Accessory Use" at G.L. § 45-24-31(3) as:
 "A use of land or of a building, or portion thereof, customarily incidental and subordinate to the principal use of the land or building. An accessory use may be restricted to the same lot as the principal use. An accessory use shall not be permitted without the principal use to which it is related."
This definition is included within the Zoning Code at Article 4.
The "customarily incidental and subordinate" clause is at issue here. This Court reviews issues of statutory interpretation denovo. See Palazzolo v. State ex rel. Tavares,746 A.2d 707, 711 (R.I. 2000). It is well settled that "the rules of statutory interpretation apply equally to the construction of an ordinance." Mongony v. Bevilaqua,432 A.2d 661, 663 (R.I. 1981). Where the language of a statute or ordinance "[`]is clear on its face, then the plain meaning of the statute must be given effect' and this Court should not look elsewhere to discern the legislative intent." Ret. Bd. ofEmployees' Ret. Sys. v. DiPrete, 845 A.2d 270, 297 (R.I. 2007) (quoting Henderson v. Henderson, *Page 7 
818 A.2d A.2d 669, 673 (R.I. 2003)). This means that when "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written."Id.
Under Rhode Island law, courts "resolve all doubts and ambiguities contained in the zoning laws in favor of the landowner because these regulations are in derogation of the property owner's common-law right to use her property as she wishes." Denomme v. Mowry,557 A.2d 1229, 1231 (R.I. 1989) (citing City of Providence v.O'Neill, 445 A.2d 290, 293 (R.I. 1982)). The Supreme Court has also stated that "[w]henever the language of a statute or ordinance is susceptible of more than one reasonable interpretation, that interpretation will be adopted which will best carry out its evident purpose." Taft v. Zoning Bd. of Review of the City ofWarwick, 75 R.I. 117, 121, 64 A.2d 200, 201 (1949).
Where "the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference, as long as that construction is not clearly erroneous or unauthorized." Labor Ready Northeast, Inc. v. McConaghy,849 A.2d 340, 345 (R.I. 2004).
The American Heritage Dictionary, Fourth Edition, defines "customary" (of which "customarily" is the adverb) as "1. Commonly practiced, used, or encountered; usual [] 2. Based on custom or tradition rather than written law or contract." The AmericanHeritage Dictionary, 450 (4th ed., 2000). "Incidental" is defined as "2. Of a minor, casual, or subordinate nature[.]" Id. at 886. Finally, "subordinate" is defined as "1. Belonging to a lower or inferior class or rank; secondary[.]"Id. at 1725. *Page 8 
Therefore, the use and structure must be commonly practiced, used, or encountered, of a minor, casual or subordinate nature, and secondary to the principal use. Relative size is not a component of this analysis.
A careful look at the statute and Zoning Code wording reveals that each of these terms modifies the word "use." By employing the term "use" rather than "structure," the drafters of these provisions evidenced an intent to regulate the activities to take place on the property rather than the size, shape, or location of the permitted building which is regulated by the building code. Therefore, the activities to take place as a result of such an accessory use must be commonly practiced, used, or encountered, of a minor, casual, or subordinate nature, and secondary to the principal use.
The "customarily incidental and subordinate" standard contained in § 45-24-31(3) and Article 4 of the Zoning Code has also been examined by the Superior Court in Wallack v. Zoning Bd. of Reviewof the Town of Little Compton, No. NC 2005-0515, 2003 WL 22803492, *1 (R.I. Super., Oct. 22, 2003). That decision explores the accessory use terminology and attempts to outline the considerations to be taken into account. TheWallack decision analyzes a zoning ordinance materially different from the one at issue in the present case, and as such, this Court will limit its analysis to the relevant portions of the decision.[4] *Page 9 
 Wallack concerned a building permit for an outbuilding on a single-family residential lot in Little Compton. See2003 WL 22803492, *1. The building was challenged by the appellant because of its large size and its qualification under that town's definition of "accessory use." See id. The Superior Court determined that the criteria for "accessory use" required a look at "the true nature and [true] character" of the proposed use rather than the collateral issue of size.Id. at *7 (citing Zeilstra v. Barrington Zoning Bd. ofReview et al., 417 A.2d 303, 308 (R.I. 1980)). Size is only analyzed with relation to the activities contemplated.Wallack, 2003 WL 22803492, *7 ("[T]here was no evidence that a structure of this size was required to accommodate the anticipated activities[.]"). Other references to size are made throughout the decision but only to aid in describing the structure at issue.
Thus, this Court finds that the "true nature and [true] character" of the proposed use is the appropriate analysis required by Articles 6 and 7 of the Zoning Code and § 45-24-31(3). To fall under the definition of "accessory use" under both of these statutes, the proposed use, as opposed to the structure itself, must be commonly practiced, used, or encountered, of a minor, casual or subordinate nature, and secondary to the principal use. Size is only considered when compared with the proposed activity as occurred inWallack. See 2003 WL 22903492, *7. The structure to house the proposed accessory use must be proportional in size to the proposed use. To determine the proposed use, the reviewing board must look at the whole record before them. See id.
(Court determined that the dearth of evidence on the record concerning applicant's proposed use warranted overturning the permit, because the size of the structure did not match with the proposed uses applicant placed on the record).
In another argument, the Appellant contends that the appeal is justified because the July 2008 decision violates the terms of the Gomes Decision rendered earlier. The term "Accessory *Page 10 
Structure" as used in the Gomes Decision (and incidentally in the Smith Decision) is not defined in either the Rhode Island General Laws or the Zoning Code. Where a term is not adequately defined, the Rhode Island Supreme Court gives zoning boards a wide berth to construe an ordinance. See Hein v.Town of Foster Zoning Bd. of Review,632 A.2d 643, 645-46 (R.I. 1993). This Court leaves that interpretation to the Middletown Zoning Board, noting only the minute difference between the term "Accessory Use" and "Accessory Structure" within the context of the Gomes Decision. As such, this Court believes that the foregoing analysis applies to the term "Accessory Structure" as used in the Gomes Decision.
 Substantial Evidence
Having determined the meaning of "accessory use" within activity and structure-oriented standards, this Court must defer to the factual findings made by the Board in its written decision.See Pawtucket Transfer Operations, LLC,944 A.2d at 859 (defer to zoning board's findings of fact). Examining the whole record before the Board, it is this Court's determination that there was substantial evidence that the outbuilding constituted an accessory use and was therefore permitted under the law.
The complete record was transmitted to this Court by Building Official Kane on August 28, 2008, in accord with § 45-24-69(a). From a thorough review of the record, it is clear to this Court that the Board was presented with "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and [encountered an] amount more than a scintilla but less than a preponderance[]" that the outbuilding at issue was an acceptable accessory use. Apostolou, 120 R.I. at 507, 388 A.2d at 825. *Page 11 
The Board's decision gives an overview of all the testimony it heard at the May 27th hearing, then it lists its specific findings of fact and renders its decision to uphold the permit. Citing the testimony, the Board notes several portions that provide substantial support for the proposition that the proposed accessory use was, indeed, customarily incidental and subordinate as described in the foregoing section. For example, the Board cites the testimony of Kane, the Building Official, who "understood the proposed structure to be a garage which was going to be used as a hobby shop by Mr. Silveira for his many personal vehicles[]" and stated his belief that the outbuilding was an "accessory structure to the residential home on the property[.]" (Smith Decision, 4.)
Mr. Silveira's testimony was noted in the decision for his description of his family and their recreational pursuits, specifically his ownership of numerous personal recreational vehicles and other machinery[5] . Mr. Silveira attested to the fact that he planned to use the single large building to house those vehicles and to provide a respite from the stresses of his daily life.[6] He repeatedly stressed his long-standing intention to house these vehicles, boats, and machinery in one tidy building, rather than litter his yard with the belongings or with several smaller sheds, as his neighbors have done. (See Tr., 37-39.) The record also proves, and the Board's decision noted, that Silveira was candid with the Smith brothers, his own realtor, and Kane about his intention to eventually build the outbuilding to house his personal recreational vehicles. (See Tr., 40, 41, 42, 45, 47; see also Smith Decision, 5-6.) *Page 12 
Furthermore, Silveira stressed that he would not be using the outbuilding for his carpentry and electrical work. Though he noted an off-chance of receiving an after-hours delivery or repairing a single vehicle there, he stated that he was not planning to run his business out of the building. (See Tr., 39, 48.) Those deliveries, he noted, would be by a UPS truck, which visit residential neighborhoods daily without complaint. (See
Tr., 39.)
Silveira's father, Joseph, testified as well. He assured the Board that his son planned to use the building for personal and recreational uses only, and that his son was a family man who enjoyed spending time with his children, thus the large collection of motorized vehicles and toys. (See Tr., 59.) Specifically, Joseph Silveira noted that his son's motivation in building the structure was to house the vehicles so that they would not litter his property and create an "eyesore[.]" (Tr., 60.) Appellant Barry Smith testified to his concerns with the size of the building. (See Tr., 5-12.) The transcript illustrates that Smith had concerns about Silveira running his business from the property, and that he raised those concerns with Silveira at a meeting before the petition to subdivide the lot was heard before the Board. (See Tr., 6.) Smith testified that he was assured by Silveira that no such operation would take place on the property. (See Tr., 6.) His only other concern as to the use of the building was the potential for numerous vehicles stored within the building. (See Tr., 11.) Overall, though, Smith was clear in his concern: "The fact that he may or may not have his business in there really isn't my main concern. My main concern is the voluminous size of this building in a residential zone. It just doesn't fit. It belongs in a commercial area, not a residential." (Tr., 11.)
John Silvia was called for the Appellant. Silvia is a real estate broker and testified to "customary and incidental use to residential properties in the Middletown area[.]" (Tr., 14.) He *Page 13 
testified that there are no other outbuildings of this size in Middletown with residential single family uses. (See Tr., 15-16.) He did, however, concede that the building is properly categorized as a garage. (See Tr., 14.)
The Appellant's brother, Brian Smith, testified before the Board as well. Brian Smith expressed his concerns about the size and steel construction of the outbuilding. (See Tr., 24.) He was worried that the sight of the building would "decimate" property values. (Tr., 25.)
Richard Carrubba, a real estate broker and licensed appraiser, testified for the Appellant. He testified to the fact that there were no similarly-sized buildings in Middletown, and he did not believe that such a large building was normally categorized as an accessory use. (See Tr., 28.)
Building Official John Kane testified. He inspected the property and issued the permit. (See Tr., 31.) His understanding was that the building was going to be a hobby shop or garage, wherein Silveira would work on his motorcycles, cars, and "personal toys." (Tr., 31.) He did concede that this was the largest garage for which he had ever issued a permit. (See Tr., 33.) He noted that any minor or infrequent repairs that Silveira would make on his work vehicles in the outbuilding would be "no different than a guy who waxes his own car and changes the oil in the driveway on the weekend[,]" pointing out that any commercial use above and beyond these infrequent and minor repairs would garner enforcement action by his department. (Tr., 54.)
The Board's decision specifically found that the six thousand (6000) square foot home was the principal structure on the lot, and that the four thousand (4000) square foot outbuilding was the proposed accessory use. (See Smith Decision, 7.) The Board specifically stated its finding that the outbuilding was "intended to be used for personal and recreational purposes only, and the owner [had] no intention of ever using the structure for commercial purposes[.]" (Smith Decision, 7.) Finally, the Board specifically found that "the proposed structure and its *Page 14 
use are accessory, incidental and subordinate to the primary residential use of the Subject Premises, consistent with" state law and local zoning ordinance, as well as all previously-rendered decisions from that body. (Smith Decision, 8.)
In light of the evidence on the record before it, the Board's decision was entirely reasonable. See Apostolou,120 R.I. at 508, 388 A.2d at 825. The Board was charged with determining the use of the proposed structure, which it did: the structure was to be used for personal and recreational purposes. There was substantial evidence that the proposed use of the building was, indeed, accessory to the primary single-family residential use. The written decision reflects this determination, and the whole record supports such a conclusion. Silveira's testimony, combined with the testimony by his father, Joseph, and the Building Official, Kane, made it clear that the intended use of the building was the storage and maintenance of personal and recreational paraphernalia, including motorcycles, go-carts, vintage vehicles, four-wheelers, and yard maintenance machinery. Single-family residential use was the undisputed primary use of the property; the outbuilding at issue was accessory to that use in that the activities the outbuilding supports were customarily incidental and subordinate to the family's needs. The Board was reasonable in finding that the "true nature and [true] character" of the use was "personal and recreational" only.See Smith Decision, 7; see also Wallack,2003 WL 22803492, *7.
Even considering the evidence that there was the possible off-chance that Silveira would use the outbuilding for maintenance on a work vehicle or to receive a UPS shipment for his company, the Board acted upon substantial evidence to the contrary. A reasonable mind could easily accept as adequate the evidence of Silveira's intention to limit those non-accessory uses to scarce occurrences.See Lischio, 818 A.2d at 960 n. 5 ("Substantial evidence . . . means such *Page 15 
relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means [an] amount more than a scintilla but less than a preponderance.").
The arguments advanced as to the size of the building did not sway the Board. As illustrated by the above analysis, the size of the building does not determine the "customarily incidental and subordinate" nature of the building; such a determination can only be made by examining the "true nature and [true] character" of the proposed use. Wallack, 2003 WL 22803492, *7. Given that Appellant and his witnesses focused on the building's size, the Board was justified in giving greater consideration to Silveira's testimony concerning use.
 Conclusion
As a result of the foregoing analysis, Smith's appeal of the Board's decision to uphold the building permit is denied, and the Court upholds the Board's decision.
Prevailing counsel shall prepare an order in conformity herewith.
[1] Smith has argued that his appeal was timely despite exceeding the thirty day limit on appeal located in the Zoning Code at § 317(A). Smith's position is that the thirty day clock runs from the time he became chargeable with knowledge of the decision, not the date of issuance. The Board's decision on Smith's appeal makes it clear that it did not consider his appeal untimely and decided the appeal on its merits. Therefore, this Court will not examine the issue.
[2] This motion was denied, along with a Motion for Preliminary Injunction, on August 15, 2008.
[3] Silveira never filed an answer to the Complaint nor has he filed a memorandum.
[4] Little Compton Zoning Ordinance § 14-10 defines accessory use as "use or structure clearly accessory or incidental to the principal use of a lot or structure and located on the site of the principal structure." This portion of the ordinance has the same effect as that in force in Middletown. The definitional section includes examples of accessory uses and structures, such as barns, carports, and sheds. § 14-10. Where the Little Compton rules differ from the Middletown rules is in § 14-3, Table 1-B. There, the ordinance makes clear the requirement that "the structure and activity are required for theoperation of the predominant and permitted use." (emphasis added)Wallack, 2003 WL 22803492, *4. No such verbiage exists within the Middletown ordinance. This is a material distinction that limits the application of Wallack to the case at bar.
[5] See Tr., 38 for a description of the belongings to be stored:
 "We have dirt bikes. We have four-wheelers. We talk about the possibility of a boat for the children in the future. I have a 1948 Chevrolet pickup truck, a 1967 pickup truck, motorcycles. We do model car racing. We do go-cart racing. I have young children. I have one son. We do a lot of things. Tractors, lawn mowers, such and such."
[6] Silveira refers to this function as an "SAC," or "spousal avoidance center." (Tr., 41.)

 *Page 1